## COLE vs. GOODWIN & STORY.

Coach proprietors are answerable as common carriers for the baggage of passengers, unless lost by inevitable accident, or through the acts of public enemies; they are also absolved from the consequences of a loss not occasioned by negligence or misconduct, where the owner is chargeable with fraud in the representation of the nature or value of the property, materially affecting the degree of care necessary to be bestowed, or the premium to be paid to the carrier, when such representation is required by the carrier, or when the owner is guilty of any other fraud in respect to the property lost.

Common carriers cannot by notice limit their common law liability as to the safety of the goods; the risk in that respect is upon them, and cannot be shifted to the owner. They may by notice, brought home to the owner, require the latter to state the nature or value of the property, or may for that purpose make a special acceptance : but they cannot by notice, rid themselves of the duty imposed by law to be answerable for the goods, unless the loss accrues by inevitable accident, or the acts of public enemies, or the owner has been guilty of fraud.

It was accordingly held in this case, that a notice, "all baggage at the risk of the owner," brought home to the knowledge of a passenger in a stage coach who lost his trunk, was no protection to the proprietors of the coach in an action against them for the loss of the trunk.

Mr. JUSTICE COWEN, in the opinion delivered by him, holds that although ordinary bailees may make their own terms with their customers, that it is not so with common carriers and innkeepers. He insists that they, from their public employment owe duties at common law, from which public policy demands they should not be discharged : and that consequently they cannot limit their common law liability even by express agreement.

Common carriers are bound to deliver to each passenger at the end of his journey, his trunk or baggage. The whole duty in this respect rests upon the carrier. The exercise of ordinary care in marking the baggage, entering it upon a way-bill and delivering a check ticket to the owner, renders easy its discharge. The passenger is not required to expose his person in a crowd, or endanger his safety in the attempt to designate or claim his property.

It was accordingly held, in this case, that the proprietors of a stage coach were responsible for the loss of a trunk, although the passenger, after his arrival at the end of his journey, permitted the coach to proceed without any inquiry for his trunk, and was silent on the subject for an hour after the coach had left. From this resolution the CHIEF JUSTICE dissented.

It seems, however, if the delivery be conformable to a well established and notorious usage, known to the passenger, that the carrier is discharged.

A new trial will not be granted on the ground of a variance between the declaration and proof, as to the amount paid for the carriage of the passenger and his baggage.

This was an action on the case against the defendants as *common carriers*, tried at the Otsego circuit in April, 1834, before the Hon. ROBERT MONELL, one of the circuit judges.

The defendants were stage coach proprietors, on a line from Cherry Valley in Otsego county, to Manlius in Onondaga county, and from thence west. The plaintiff took a seat in one of their coaches as a passenger from Cherry Valley to Madison, a town in the line of the route, and paid the usual fare for himself and his baggage, consisting of a trunk containing clothing, $20 in bankbills, and a few books. The *name of the plaintiff* and the *place of his destination* were marked on a way-bill, but no mention made of his trunk. The trunk was put *on board*, said the witness, (probably in the usual place for carrying baggage.) The distance from Cherry Valley to Madison is 42 miles. The coach arrived at Madison about seven o'clock in the morning, and was driven to the stage-house, the usual stopping place for breakfasting. The plaintiff left the coach and walked across the street, giving no directions as to his trunk; he returned to the stage-house and took breakfast. There was a change of horses and driver at this place, *but no change of the coach.* The coach stopped at Madison about an hour. The new driver, when about to start, asked the plaintiff, supposing him to be a passenger, if he was going on, and received an answer in the negative. The coach then drove on. About an hour afterwards, the plaintiff inquired for his trunk of the driver who drove the coach to Madison, who answered that he did not know that he had a trunk, and asked him why he had not spoken about it. This driver testified that when he saw the plaintiff leave the coach and go across the street he supposed he had left, and had no baggage. Eleven months after the loss of the trunk, it was found at Auburn and brought back to Hamilton, where it was opened and all its contents found safe except that only $3 in bank bills were found in the trunk instead of $20 put in at Cherry Valley. It was proved that it was an invariable custom in respect to this line and stage-coaches generally carrying passengers and their baggage, not to take off any of the

baggage at the stopping places *where the coaches were not*
*changed,* unless at the request of the passengers : proof of
this custom was objected to, but received by the judge.
It was also proved that the defendants had posted up at all
the stopping places of their coaches, advertisements in re-
spect to their line of stage-coaches, containing a notice
" *all baggage at the risk of the owner ;*" and that such an
advertisement was posted in the stage house at Cherry Val-
ley, where the plaintiff resided, and it was also proved that
the plaintiff *had knowledge of such notice.* The judge
charged the jury that the defendants were *bound to deliver
the trunk to the plaintiff* on the arrival of the coach at
Madison, notwithstanding the usage not to remove trunks and
baggage when the coaches were not changed unless at the
request of passengers : inasmuch as there was no proof that
the plaintiff had notice of such usage, or of the fact that the
coaches were not changed at Madison. He further charged
that although the notice given by the defendants that " all
baggage was at the risk of the owner" was fully proved, and
also that the plaintiff had knowledge thereof, yet such
notice did not excuse the defendants or save them from
liability *as common carriers,* though, it might make the
passenger more prudent. The defendants' counsel excepted
to the charge. The jury found a verdict for the plaintiff
for $101,96. The defendants made a case with leave to
turn the same into a special verdict or bill of exceptions.
The case presented several minor questions which are
noticed in the opinion delivered by Mr. Justice BRONSON.
The cause was very fully argued, on a motion for a new
trial at January term 1836, by J. A. Spencer, for the
defendants, and by L. C. Saxton, for the plaintiff. It
remained under advisement until July term 1837, when a
change having taken place on the bench of the court, a
re-argument was had by P. Gridley, for the defendants, and
by C. P. Kirkland, for the plaintiff, and again remained
under advisement until this term, when the following
opinions were delivered :

By Mr. *Justice* BRONSON. The opinion delivered by me in the preceding case of *Hollister* v. *Nowlen*, renders it unnecessary to examine some of the questions made on the trial. That coach proprietors are answerable as common carriers for the baggage of passengers, and that they cannot limit their liability by a general notice brought home to the employer, are now settled questions, so far as this court is concerned.

The objection that *both* of the defendants are not responsible for the act, or default of the driver employed by *one* of them, is answered by the case of *Bostwick* v. *Champion*, 11 Wendell, 571, affirmed in error. 18 Wendell, 175.

The declaration alleges that the plaintiff delivered and the defendants received the trunk and contents to be safely and securely carried, &c. for a certain reasonable reward, to wit the sum of *three dollars.* The proof was that the fare paid was *two dollars* for the plaintiff and his baggage. The variance is not very material. It would have been sufficient to state that the defendants were to receive a certain reasonable reward, without specifying any sum. 2 Chitty's Pl. 319, 321. Since the case of *Lyon* v. *Burtis*, 18 Johns. R. 510, it has been the practice at the circuits to overlook mere formal mistakes of this kind, by which the party cannot have been prejudiced, and to allow an amendment after verdict. If the plaintiff deems it important, he may amend the declaration without costs. This is not a case for imposing terms.

The defendants insist that they were only carriers of the trunk to Madison, and were not bound to take it from the coach, or deliver it at that place, without a notice or request from the passenger. In the form in which the objection was taken on the trial, it seemed to be thought important that the trunk was not booked, nor entered in the way-bill; and that it was not labelled or directed to any particular person or place. These are not matters of which the defendants can complain. It was for them, and not the plaintiff, to determine whether the trunk should be mentioned in their books, or entered on the way-bill; and whether they would carry the trunk without a label or di-

rection, was also a matter for their consideration when the contract was made. Having assumed the responsibility of carrying the property, it is not for them to object that they did not adopt all proper precautions to guard against accidents. If the plaintiff on request had neglected or refused to comply with any reasonable regulation of the defendants, it would have presented a different question. But nothing was required of him but the usual fare, and that was paid. In considering whether the defendants are answerable for not delivering the trunk at Madison, it is important to notice that no fraud or intentional concealment is imputed to the plaintiff. Nothing of the kind was pretended on the trial. The plaintiff was a youth, then probably leaving his parents for the first time to enter a public school. Wanting experience as a traveller and having his thoughts engrossed with other subjects, he forgot his baggage until the coach had departed. This was the whole extent of his error. If the cause turned on the want of diligence, there would perhaps be some difficulty in saying which party ought to bear the loss; though my opinion would in that view of the case, be against the defendants. They certainly were not without fault. They might have mentioned the trunk as well as the passenger on the waybill, and thus have advised their coachman and agents that the plaintiff had baggage to be removed at Madison. As this precaution was omitted, it was the duty of the driver, if he did not know how the fact was, to enquire of a passenger leaving the coach whether he had baggage to be removed. But there was a further and most culpable neglect of duty in not pursuing after the coach, when the plaintiff missed his baggage. The coach had been gone but a short time, and at the rate it was travelling might easily have been overtaken. The plaintiff was among strangers, and had no means of pursuing. He applied to Wilbur, the coachman who had driven to Madison, to go after the stage, and was answered that he had no horse. The answer was false, for the horses had been exchanged at that place. Goodwin, the defendant's agent, was absent. The plaintiff applied to his son, but he declined doing any thing.

He also applied to the keeper of the stage house, but with no better success. The defendants select their own servants, and are answerable for their defaults. The coachman was chargeable with gross negligence for not pursuing and recovering the property. He probably thought more of the saving clause in the advertisement, "all baggage at the risk of the owner," than he did of the suffering traveller.

The defendants set up a *usage* in managing their line of stages, to discharge themselves from liability for the loss of the trunk. The usage proved amounts to this : At Richfield and Bridgewater, where the coaches are changed, the baggage is removed as a matter of course ; but at Madison, where the coaches are not changed, they only remove baggage at the request of the passenger. How is the traveller to learn this practice of the defendants, which is different at the two ends of a single stage, except by that kind of experience which the plaintiff has acquired ? There is no evidence that he knew any thing about this practice. And besides, the usage only proves that the defendants have been habitually careless in managing their business. It does not go far enough. They should have established a usage to be exempt from the legal consequences of their negligence.

But in the absence of all fraud on the part of the plaintiff, this cause does not turn on the question of diligence. The defendants were common carriers as to the baggage ; and as such were answerable for any loss of the property which was not occasioned by the act of God or the public enemies. It is wholly unimportant to inquire whether there was any actual default on their part. It is enough that the property was lost ; and that, the loss did not happen in either of the two ways which according to the law of the land will exempt the carrier from liability. We cannot add a third ground of exemption, and say that when the owner accompanies the property, the carrier shall be discharged. If the defendants were common carriers as to the baggage, there is an end of the question. Whether the trunk was stolen before it reached Madison, or lost to the plaintiff in

consequence of being carried beyond that place, are mat-
ters of no moment.  The effect of the owner's accompany-
ing the property, or sending a servant to look after it, is
noticed in the case of *Hollister* v. *Nowlen,* (ante.)  There
is no principle upon which it can affect the liability of the
carrier as to property committed to his charge, unless there
was some fraud on the part of the owner.  The defendant's
counsel have only been able to  refer to a single case as
containing a qualification of the rule, and that will be found
not to answer their purpose.  *East India  Co.* v. *Pullen,* 1
Str. 690.  The defendant was a common lighterman, and
the action was on an undertaking to carry on the Thames
from the ship to the plaintiff's ware house.  The company
put an officer in the lighter, who, as soon as the lading was
completed, *put the company's lock on the hatches,* and went
with the goods to see them safe delivered at the warehouse.
A part of the goods were lost.  Raymond, C. J. said, " this
differed from the  common case, this *not. being any trust in
the defendant,* and the goods were not to be considered as
ever having been in his possession, but in the possession of
the company's servant,  who had hired the  lighter to use
himself."  This case, instead of impugning, goes to confirm
the rule already mentioned.  In the case at bar, the plain-
tiff had no charge of the property.  It was committed to
the trust of the defendants.  They received it into their
possession, and disposed of it as they thought proper, with-
out any instructions or interference on the part of the plain-
tiff; and by the law of the land, they are answerable for
the loss.

By Mr. *Justice* COWEN.  The defence in this case cer-
tainly sets up a very easy way of dealing with stage-coach
passengers.  It cannot be denied that the defendants are,
*prima facie,* as much conmon carriers in respect to the
baggage of passengers, as any thing else which they convey
for hire.  As such they are, according to all the books, in-
surers against losses except such as arise from the act of
God, or the public enemy.  The accident in question can
in no sense be called either.  It was less than inevitable

accident, for all risk was avoidable by a moderate degree of attention, the most obvious of which was an entry on the way-bill according to some mark or other designation, and noting the place of destination, ⎰where by law the carrier is bound to make delivery. *Gibson* v. *Culver*, 17 Wendell, 305, and the cases there cited. This obligation is sought to be qualified by a usage of the defendants' line, to which the plaintiff is a total stranger. Indeed, in the absence of knowledge of the usage, he is told that the charge of the baggage belonged to himself; and that by silently departing from the stage at Madison, with apparent unconcern, he improperly lulled the driver into a state of carelessness. It is an answer, that all this was avoidable by a little seasonable caution ; and I have yet to learn that when a common carrier is called to account for losses, the passenger is to be .answered by his own want of care. It is placing the obligation upon the wrong man. The passenger has surrendered the custody of his baggage to the coach owners, whose obligation is absolute ; and the law will not endure that they should answer either by the utmost care in themselves, or the want of it in another. I speak independent of all usage ; for none is brought to the knowledge of the plaintiff. The carrier must take measures at his peril to learn and abide by the place of delivery, either as fixed by law, or at the utmost by the established and notorious usage of the line : such usage being known to the passenger. *Gibson* v. *Culver* before cited. It was so held in *Forward* v. *Pittard*, 1 T. R. 27, where a fire not occasioned by *lightning*, but burning with inextinguishable rage, communicated with and consumed the article. The accident was there said to be inevitable ; but the court held it must be more ; and Lord Mansfield instanced the destruction of property by the riot of 1780, as no excuse. It is true the owner was not, in that case, with the goods ; but his presence would have made the defendant no less a common carrier, as was conceded by the present chief justice, in *Orange Bank* v. *Brown*, 9 Wendell, 117. We are reminded of the custom for the owner to attend and point out his baggage to the carrier, at the place of his departure

from a steam-boat, car or coach. If the carrier will depend
on the care of the owner (and I admit there is often a necessity for it under every responsibility) he certainly may do so ; but it is a solecism to say he is a common carrier while we deny the very duty which is essential to that character. A mere chalk mark and the dash of a pen upon the way-bill would in most cases avoid all risk ; and it would be strange indeed that the omission of an easy precaution should be deemed by the law equivalent to the act of God. It is really too much like gross negligence. The owner many times can not reach the baggage room on account of the crowd ; and if you demand that he should mention or call for it, you require an exertion of body or lungs, to which few would be equal under all emergencies. Beside he may not know whom to address. Are you bound to mark the direction yourself? The carrier knows the stopping place, which is perhaps resolved on at the moment, and he holds the way-bill. If the article be not properly directed and entered, let him wait till both be done, or refuse for that reason to undertake what he cannot perform, if there be not time to affix the proper marks. He knows what marks and entries will accord with his system of business, and be intelligible to his agents on the line. All this care belongs in good reason, where the law has placed it, with the carrier himself. The question is one of simple custody, for care follows custody. This has been held of an inn-keeper, whose obligation is much like that of a carrier, and stands upon the same reason. 2 Kent's Comm. 591, 3d ed. He is liable for all the goods which his guest brings with him to the inn, even though he hold the key of his chamber where the goods are. Story on Bailm. 313, § 479. 2 Kent's Com. 593, 4, 3d ed. But if he take the exclusive custody of the goods or positively interfere with them so as to put them in peril, or deliver them to a third person for custody, the innkeeper is exonerated. Story on Bailm. 315, § 483. 2 Kent's Com. 595, 3d ed. "It appears to me," said Bayley, J., in *Richmond* v. *Smith,* 8 Barn. & Cress. 9, "that an innkeeper's liability very closely resembles that of a carrier. He is *prima facie*

NEW-YORK, liable for any loss not occasioned by the act of God or the
May, 1838. king's enemies, although he may be exonerated where the
Cole       guest chooses to have his goods under his own care.    The
v.         analogy was in some measure extended to the carrier by
Goodwin.   the case of *Miles* v. *Cattle*, 6 Bing. 743.    The plaintiff, a
passenger, had with him his own bag of clothes in the
coach, into which bag he slipped a £50 bank note belonging to
another, who had directed it to be booked at the carrier's office.
It could not have been booked without a reward.    The plain-
tiff thus had it in his exclusive custody, and therefore it was
held that he should not recover.    In another respect the case
was like that before us.    At York, his place of destination, he
got out of the coach and walked away and was gone two
hours ; yet the point was not even made, that he should for
that reason fail to recover for his bag and clothes, which had
been purloined with the note during his absence.    And this,
though the case was stronger for a point of gross neglect
than the present ; for he retained the actual though not the
exclusive custody of his bag.    In the case before us the
regular fare was paid for the plaintiff and his baggage ; and
the trunk probably placed in the usual separate department.

But the more effectually to secure impunity for absolute
carelessness, the defendants gave notice, that *all baggage was
at the risk of the owner.*    This, taken literally, is another
mode of fastening all the duty on the passenger, exactly in-
verting the obligation imposed by law.    It is saying "I like
your passage money, and the emoluments of my public em-
ployment as a common carrier of passengers and their
baggage.    I will take my reward, but choose to consult my
convenience and safety in the measure of responsibility."    If
the carrier have the legal power to restrict any branch of his
liability either by special contract or notice, it is certainly im-
portant to inquire, looking at the consequences, whether such
power be arbitrary and illimitable.    If it be, there is no end
to this kind of encroachment ; and the passenger may as well
be required to risk his limbs or his neck.

NEW-YORK,
May, 1838.

Cole
v.
Goodwin.

All must agree with what was said on the argument, that a man may become a common carrier or not at his option; and that he may limit his office to the carrying of persons *or* goods as he pleases, and at such general prices as he may choose to charge. 2 Kent's Com. 598, 3d ed. But his office as a common carrier once becoming fixed and his line of travel, subjects of carriage, and prices established it is much more questionable whether, in respect to passengers or goods which are fairly committed to him, he can qualify his public duty. It is agreed by all the books, that while he enjoys the privileges of a common carrier, there are certain duties pertaining to that office which he can not escape in any form. In the first place, he is bound to receive passengers and goods, if he have room, and carry them for a reasonable reward, which may be set down as the accustomed reward for like services. 2 Kent's Com. 598, 3d ed. and cases there cited in note f. Per Mansfield, C. J. and Lawrence J. in *Harris* v. *Packwood*, 3 Taunt. 271, 2. Per Best, C. J. in *Riley* v. *Horne*, 5 Bing. 217. 2 Moor. & Payne, 331, 338, S. C.

It is equally well settled that he can not, either capriciously in a single instance, nor by public notice seen and read by his customer, nor even by special agreement, exonerate himself from the consequences of gross neglect. Per Best, C. J. in *Riley* v. *Horne*, 5 Bing. 218. 2 Moor. & Payne, 331, 341, S. C. *Sleat* v. *Fagg*, 5 Barn. & Ald. 342. *Wright* v. *Snell*, id. 350. *Birkett* v. *Willan*, 2 Barn. & Ald. 356. *Beck* v. *Evans*, 3 Camp. 267. 16 East, 244, S. C. *Bodenham* v. *Bennett*, 4 Price, 31. *Smith* v. *Horne*, 8 Taunt. 144. 2 Moor. 18, S. C. *Newborn* v. *Just*, 2 Carr. & Payne, 76.

It is said in the Doct. & Student, Dial 2, ch. 38, p. 224 of Machall's ed. "If he [the carrier] would per case refuse to carry it unless promise were made unto him that he shall not be charged for no misdemeanor that should be in him, the promise were void; for it were against reason and against good manners; and so it is in all other cases like." In Noy's Maxims, 92, it is said, "If a carrier would refuse to carry unless a promise were made to him that he

shall not be charged with any such miscarriage, that pro-
mise is void." Gross negligence is in general a species of
fraud, though it may not be always so. Story on Bail. 13,
§ 19 to 22. And an agreement giving direct countenance
to a fraud would be contrary to public policy. It is equal-
ly well settled that a special agreement, or which is the same
thing, a notice seen and acted upon by the owner of goods,
will not protect the carrier against the consequences of the
malfeasance or misfeasance of himself or his servants; as
if they convert the goods or make a wrong delivery. Story
on Bailm. 365, § 570, and the cases there cited. *Beck* v.
*Evans*, 16 East, 244. Indeed all this would be so, could
we suppose the carrier's obligation brought down to that of a
mere mandatary.

Passing below gross neglect and misfeasance, the balance
of opinion in Westminster Hall would seem to be that the
liability of the carrier may be dispensed with. Story on
Bailm. 365, § 571, and cases there cited. I think *Low* v.
*Booth*, 13 Price, 329, may be set down as a direct adjudica-
tion that ordinary neglect may be provided against by the
parties.

But the great question is, under what limitations may the
parties provide for a reduction of the liability. For one, I
hardly feel warranted to interpose a general denial that the
*extraordinary responsibility* of the common carrier may be
taken away by the joint act of the parties; and such I take
a proper notice to be if known to the bailor. I agree that
there is no adjudication of a date so ancient, that we are
obliged to respect it as authority, giving the common carrier
a right to take a fair reward for the carriage, and yet acquit
himself of his obligation as such. Admitting the doctrine of
notice to have that effect, and to be as old as *Forward* v.
*Pittard*, 1 T. R. 27, as was said by Burrough, J. in *Smith* v.
*Horne*, 8 Taunt, 144, 146; 2 Moor. 18, 22, S. C; yet we
are carried back no farther than 1785, about ten years after
the revolution. And even so soon after, we find the learned
judge adding: "It can not but be lamented that such no-
tices have ever been used, and recognized as a protection to
carriers, to divest them of their responsibility." 2 Moor.

22. If he meant a general and arbitrary power of protection, I think every one must concur with him; but if he is to be understood as speaking to the extent of the case before him, it appears to me that the notice was very properly allowed to avail both upon principle and authority. It was thus: "That they (the carriers) would not hold themselves accountable for cash, writings or any article above the value of £5, *unless entered and paid for according to its value, when delivered to their agents.*" 2 Moor. 19; more briefly 8 Taunt. 144, 5. I am inclined to think by what fell from Park, J. in the same cause, that both he and Burrough, J. must have alluded to the disposition of carriers to extend their protection by notices beyond the principle on which they were originally allowed. Park, J. said "The indulgence given to carriers by limiting their responsibility by the notices usually affixed in their offices, has occasioned great public inconvenience. The courts have lately been inclined to restrain them." 2 Moor. 21, 2. And they determined that even this, the usual and allowed notice, should not protect the defendants against gross negligence.

To appreciate in a proper manner the particular notice in question, it is necessary to advert briefly to the relative obligation of the carrier and owner. The former is an insurer against loss by any event except the act of God (now holden to be synonymous with inevitable accident) or the enemies of the republic. Per Holt, J. in *Coggs* v. *Bernard,* 2 Ld. Ray. 918. *Forward* v. *Pittard,* 1 T. R. 27, 33. To this may be added another exception; a loss by the fraud, and perhaps the gross neglect of the owner in a case where he owes a duty. *Bradley* v. *Waterhouse,* 3 Carr. & Payne, 318. *Whalley* v. *Wray,* 3 Esp. N. P. C. 74. It follows, that the obligation of the owner is like that of other persons who cause their property to be insured. He must act in good faith, and at least, if he speak at all, give a correct account of every circumstance peculiarly within his own knowledge, which is material to the risk which the insurer incurs according to the legal nature of his engagement. The case of *Kenrig* v. *Eggleston,* Aleyn, 93, was very severe upon the carrier. The plaintiff delivered a box

to the carriers's porter, telling him there was a book and tobacco in it: in truth it contained £100 besides. The whole was lost, and the carrier held liable for the money. "It was agreed by the counsel, and given in charge to the jury, that if a box with money in it be delivered to a carrier, he is bound to answer for it if he be robbed, although it was not told him what was in it. And so it was ruled in one Barcroft's case, as Rolle said, where a box of jewels was delivered to a ferryman, who, knowing not what was in it, and being in a tempest, threw it overboard into the sea: and resolved that he should answer for it." Rolle finally directed, "that although the plaintiffs did tell him of some things in the box only, and not of the money, yet he must answer for it; for he need not tell the carrier all the particulars in the box. *But it must come on the carrier's part to make special acceptance.*" He left the question of the intended cheat to the jury to consider in damages; and they found the whole £100, deducting £3 for carriage. It is indeed not surprising, as added by the reporter, "*quod durum videbatur circumstantibus.*" The general principle laid down in this case as derived from Barcroft's, so far from having been ever questioned, has been repeatedly affirmed, though it has been thought to have been there wrongly applied, inasmuch as there was evident artifice made use of to disguise the fact of there being money in the box. This case was decided in 24 Car. 1. See per Best, C. J. in *Riley* v. *Horne,* before cited. There is a still stronger case against the carrier cited by Hale in *Morse* v. *Slue,* 1 Ventr. 238.

In the case of *Tyly* v. *Morrice,* 11 Wm. 3, Carth. 485, the plaintiffs' servant delivered to the defendant's book keeper £450 in two sealed bags, and told him it was £200, which the book-keeper receipted in writing as "two bags of money sealed up, said to contain £200." The whole being lost by a robbery, the carrier paid £200, and the plaintiffs sued for the balance on the authority of *Kenrig* v. *Eggleston.* The court distinguished the case, and confined the plaintiffs' claim to what had been paid, "Because there was a particular undertaking by the carrier for the carriage

NEW-YORK,
May, 1838.

Cole
v.
Goodwin.

of £200 only, and his reward was to extend no farther than to that sum, and 'tis the reward which makes the carrier answerable ; and since the plaintiffs had taken this course to defraud the carrier of his reward, they had thereby barred themselves of that remedy which is founded on the reward." The case of *Fitchburne* v. *White*, 5 Geo. I. Feb. 16th, 1718, is thus reported in 1 ° Str. 145. " Per King, Ch. J. If a box is delivered generally to a carrier, and he accepts it, he is answerable though the party did not tell him there is money in it. But if the carrier *asks* and the other says *no*, or if he accepts it *conditionally*, provided there is *no money in it*, in either of these cases, I hold the carrier is not liable. Aleyn, 93 is cited as authority. The case of *Gibbon* v. *Paynton*, 4 Burr. 2298, approves of the general doctrine in *Kenrig* v. *Eggleston*, but thinks it misapplied. I have noticed these cases, and some of them at large as showing, 1. that the carrier is liable in respect to his reward ; but 2. that to raise in the law a respect to his reward, he must make a special acceptance, or at least *inquire* and obtain a positive representation. It follows that if the plaintiff either answer untruly, or on request refuse to make any reply whatever, the carrier may say either that he will not receive the goods, or that if he receives them, it shall not be as a common carrier ; indeed that he will not consider himself accountable as a bailee for reward. He may either refuse to receive pay for the carriage, or refuse to receive a premium beyond a certain amount. I forbear to go farther into the cases, because I think these general propositions are all substantially adjudged by this court in the late case of the *Orange Co. Bank* v. *Brown*, 9 Wendell, 85, 114, 115.

Then reading the cases on this subject, and especially that of *Kenrig* v. *Eggleston*, and *Morse* v. *Slue*, will any one say that the carrier shall be liable, where the owner refuses to concur in any reasonable request on his side to avoid imposition ; to make every thing honest and fair ? Was it unreasonable then in the carriers, to demand, as in *Smith* v. *Horne*, that all over £5 should, in order to fix the carrier with loss, be entered and paid for according to its value ?

What is this but demanding what no one can deny, that the laborer shall be paid according to his hire. Is it unreasonable to make a condition that the owner shall be honest? How far it is so, let us see from another case, *Gibbon* v. *Paynton*, 4 Burr. 2290. The defendants had properly advertised, that their coachman would not be answerable for money or jewels or other valuable goods, unless he had notice that such were delivered to him; and it was probable that the plaintiff knew of the notice, and understood, that by the course of trade, money was not carried without an extra premium. Yet the plaintiff delivered to the coachman £100 hid in hay in an old nail bag. The bag and the hay were carried safely; but the money was lost. It was held that the plaintiff could not recover. This case is remarkable as being among the earliest cases, if not the very first case in which the carrier's notice appears. It was in Easter Term, 9 Geo. 3. A. D. 1769. Lord Mansfield proceeded entirely independent of the notice; he considered the plaintiff's conduct fraudulent, though he does not deny that mere silence as to the amount, may in general be honest, if the plaintiff be not called out by the carrier. Yates, J. considered the notice equivalent to a special acceptance. He said "this was a special acceptance." Arston J. also hinted at the same ground: and both he and Lord Mansfield laid great emphasis on the principle, that a carrier is liable in respect to his reward.

It is obvious that if the owners are open to frauds when once the goods are committed to the hands of the carrier, the latter is equally exposed to imposition in the delivery; and while it is reasonable that he should demand notice of what he is called upon to transport, is it not equally reasonable that he should make other regulations as to booking the goods? Best, C. J. in *Riley* v. *Horne*, after mentioning as an excuse for using a printed notice, that "It would be inconvenient, perhaps impossible to have a formal contract made for the carriage of every parcel, in which the value of the parcel should be specified, as well as the price to be paid for the carriage," proceeds, "But it would add very little to the labor of the book-keeper, if he entered the value

of each package, and gave the person who brought it a written memorandum of such entry, like the slips now made on an agreement for a policy of insurance." I have yet to learn that any thing calculated to insure an exercise of good faith on either side, or a full understanding of the contract, or to furnish the proper evidence of the contract, may not be demanded. I will add, that all this is due to the safety of the carrier, whose means of providing even for his general security, as well as for that of the particular package, may be materially affected by temptations to robbery concealed from him in trunks, boxes or old bags of hay, but perhaps known to others through the treachery of the owner's servants, and in flagrant cases, of the owner himself. I have already noticed in another connection, the importance of an entry to be transferred to the way-bill, as a guide for the carrier's agent at the point of destination and delivery.

Laboring under the difficulty of making inquiries or drawing up special acceptances in each case, and knowing that a silent acceptance on their part would open them to interminable frauds, carriers resorted to the notice as a proper substitute. If such as a carrier has a right to give, it is in its own nature and according to all the analogies of business, when brought home to the owner, and this must always be proved, a proposition, which if followed by the delivery of the parcel, fastens upon the transaction the conditions or other terms specified. *Bignold* v. *Waterhouse*, 1 Maule & Selw. 255, is very strongly illustrative of this position. The defendants have given the usual notice, that value above £5 must be entered and paid for. That not being done, Lord Ellenborough, C. J. said "There was no contract at all between the plaintiffs and defendants; in which case *non oritur actio*." In *Batson* v. *Donovan*, 4 Barn. & Alderson, 21, Best J. and the whole court agreed that though the carrier must make the proper inquiries, yet " the effect of the notice is to prevent the necessity of a particular inquiry in each case." *Harris* v. *Packwood*, 3 Taunt. 264, is also, that unless the notice be complied with, there is no contract at all, and in case of loss, the plaintiff can not recover even the lesser sum specified.

So long as the printed notice of a common carrier is confined to the purposes which I have enumerated, and others calculated to save himself, without mischief to his customer, or for the benefit of the latter, I see no objection in principle to give it full effect. So far it is not a refusal to carry for a reasonable reward. So far it is not a limitation of the carrier's liability. He merely declares to the customer what is true and just: "You know the value of your goods; I will not rummage your parcel; I will take your own account; but I will not incur the responsibility of a common carrier unless your account shall prove true. If you commit a fraud or deal captiously or capriciously on your own part, you can not complain if my duty is reduced to that of a mandatary."

I have taken pains to look at the English cases concerning carriers' notices, with a view to the principles mentioned; and considering the loud and repeated complaints which have been made against them as a pernicious innovation, I have been disappointed to find them, with very few exceptions, confined within those principles, and well sustained both by authority and the analogy of the law of insurance. To deny that nearly all of them, I do not say quite all, so far as they give general effect to such notices, are not to enter into and form a part of our own law, would, it appears to me, be to rise against the united authority of Westminster Hall, both before and since the revolution. I do not speak of the various qualifications under which they have been received, arising from some differences of language in the notices themselves, diversity of circumstances to which they have been applied, or the conflict of judicial authority. These may justly form the subject of complaint. But to make a difficulty in understanding and applying the language of commercial instruments an objection to the instruments themselves, would long since have stricken many such from existence.

Most of the litigation upon this subject has arisen] from notices said to have been got up with a view to protect carriers by land in wheel carriages or sleighs. The cases are very numerous, and I can not pretend to cite them all;

but will simply refer to such as I have found on considerable search, in order that it may be seen whenever thought worth while, how nearly they all come in principle and mostly even in words and letters, to the examples already exhibited from *Smith* v. *Horne*, and *Gibbons* v. *Paynton*. Vide, *Yate* v. *Willan*, 2 East, 128. *Izett* v. *Mountain*, 4 id. 371. *Clark* v. *Gray*, 6 id. 564. 2 Smith, 262, and 4 Esp. 177, S. C. *Nicholson* v. *Willan*, 5 East, 507, 2 Smith, 107, S. C. *Batson* v. *Donovan*, 4 Barn. & Ald. 21. *Thorogood* v. *Marsh*, 1 N. Gow. 105. *Covington* v. *Willan*, id. 115. *Bignold* v. *Waterhouse*, 1 Maule & Sel. 255. *Riley* v. *Horne*, 5 Bing. 217. *Newborn* v. *Just*, 2 Carr. & Payne, 76. *Brooke* v. *Pickwick*, 4 Bing. 218. *Garnett* v. *Willan*, 5 Barn. & Ald. 53. *Sleat* v. *Fagg*. id. 342. *Bradley* v. *Waterhouse*, 3 Carr. & Payne, 318. *Macklin* v. *Waterhouse*, 2 Moor. & Payne, 319, and *Riley* v. *Horne*, id. 331, both these cases reported in 5 Bing. 217, under the title of *Riley* v. *Horne*. *Roskell* v. *Waterhouse*, 2 Stark. 461. *Hutton* v. *Bolton*, 3 Doug. 59; 1 H. Black. 299, S. C. note. *Kerr* v. *Willan*, 6 Maule & Sel. 150; 2 Stark. R. 53, S. C. *Davis* v. *Willan*, 2 Stark. R. 279. *Alfred* v. *Horne*, 3 id. 136. *Clayton* v. *Hunt*, 3 Campb. 27. *Butler* v. *Heane*, 2 id. 415. *Rowley* v. *Horne*, 10 Moor. 247; 3 Bing. 2 S. C. *Beck* v. *Evans*, 16 East, 243; 4 Campb. 267, S. C. *Wilson* v. *Freeman*, 3 id. 527. *Levi* v. *Waterhouse*, 1 Price, 280. *Low* v. *Booth*, 13 id. 329. *Down* v. *Fromont*, 4 Campb. 40. *Munn* v. *Baker*, 2 Stark. R. 255. *Gougher* v. *Jolly*, 1 Holt, N. P. Rep. 317. *Cobden* v. *Bolton*, 2 Campb. 108. *Marsh* v. *Horne*, 5 Barn. & Cress. 322. *Bodenham* v. *Bennett*, 4 Price, 31. *Mayhew* v. *Eames*, 3 Barn. & Cress. 601. *Clay* v. *Willan*, 1 H. Black. 298. If instead of looking at the original cases, any one be desirous of seeing their general character at a shorter glance, he will find many of them abstracted in Wheat. Selw. N. P. Carriers 2; and still more copiously in 5 Petersd. Abr. Carriers by land, p. 64 to 86, Am. ed. with Ham. Suppl. Carriers, Notices, effect of, p. 227 to 236.

NEW-YORK,
May, 1838.

Cole
v.
Goodwin.

These notices have, in some of their aspects, been occasionally vindicated, per Lawrence, J., in *Harry* v. *Packwood*, 3 Taunt. 264, and Best, C. J., in *Riley* v. *Horne*. In the first case, Mansfield, C. J., complained of them as leading to frauds, by disclosures of value to persons standing around; but he adds, however inconvenient that may be, " it seems that from the days of Aleyn down to this hour, the cases have again and again decided that the liability of a carrier may be so restrained." Lord Ellenborough, in *Down* v. *Fromont*, 4 Campb. 40, expressed his sorrow that carriers had been allowed to limit their common law responsibility at all, and said that some legislative measure upon the subject would soon become necessary. Several statutes had then already been passed in England fixing limits to the responsibility of carriers by water ; and in 1830, the stat. 1 Wm. 4, 68, restrained the effect of the notice by land carriers ; but adopted the great principle of the notice by requiring the owner to state the value of certain enumerated articles to the carrier at the time of delivery. A short abstract of these statutes are given in 2 Kent's Comm. 605, and the note there. The statute of 1830, is stated more at large in id. 607, note c. And it is handsomely abridged section by section, with all its provisions, in Smith's Mercantile Law, 170. 171.

Some few American books may be said to amount to a general recognition of the validity of the carrier's notice, without, however, fixing any boundary to its object or operation. *Orange County Bank* v. *Brown*, 9 Wendell, 115, per Nelson, J.; *Phillips* v. *Earle*, 8 Pick. 182. *Bean* v. *Green*, 3 Fairfield, 422.

So much both for judicial and legislative action, the great mass of which has been directed to enforce a fair course of conduct on the side of the bailor. They all go upon the most obvious ground : that a man shall not raise an action in his favor out of his own fraud or neglect.

C. J. Best, 2 Moor. & Payne, 341, 2, thus sums up the points which are material to the case before us ; " That a carrier is an insurer of the goods that he carries ; that he is obliged for a reasonable reward to carry any goods that

are offered him, to the place to which he professes to carry

goods, if his carriage will hold them and he is informed of
their quality and value; that he is not obliged to take a
package, the owner of which will not inform him what are
its contents and of what value they are; that if he do not
ask for this information, or if, when he asks and is not
answered, he still takes the goods, he is answerable for their
amount whatever that may be; that he may limit his
responsibility as an insurer by notice." It is the extent of
this right of notice or of special acceptance which is the
important object of attention.

Suppose all the reasonable terms of the carrier complied
with; the value disclosed, or the goods weighed where
that is required as it may be, per Nelson, J. in *Orange Bank*
v. *Brown,* 9 Wendell, 114, *Munn* v. *Baker,* 2 Stark. R
255, the premium paid or secured without inquiry, or
according to value or weight, the goods booked and placed in
the coach beyond the reach or the knowledge of the owner ;
having come hundreds of miles perhaps of his journey, rely-
ing on coach owners who take all the benefits and privileges
of common carriers, he meets on going into an office,
*for the first time* with the unqualified notice, " all baggage
at the risk of the passenger." Suppose a case of no notice,
but simple refusal to take on common law terms ; no one will
pretend that the carrier could enforce such a claim. Is the
notice any thing more ? It comes to the .bailor's knowledge
for the first time in his life. He is surprized with a declara-
tion that all his reliance for the safety of his baggage is gone,
unless he shall, in case of its loss have the luck to prove by
the servants of the coach owner, the instruments of misfeas-
ance or neglect, that one or the other has intervened. What
is the reason that the common law will not excuse the carrier
unless he show the act of God, or the enemies of the republic,
or the misconduct of the plaintiff? This, says Lord Holt,
" is a politic establishment, contrived by the policy of the law
for the safety of all persons the necessity of whose affairs
require them to trust these sorts of persons, that they may be
safe in their ways of dealing ; for else these carriers might

NEW-YORK, have an opportunity of undoing all persons that had any
May, 1838. dealings with them, by combining with thieves &c., and yet

Cole       doing it in such a clandestine manner as would not be possi-
v.         ble to be discovered." *Coggs* v. *Bernard,* 2 Ld. Raym.
Goodwin.   918. Nor was this said of a barbarous people or a barbarous
age; but in the reign of Queen Anne, of morals, arts and
arms, an age distinguished as the Augustan era of England.
As late as 1828, in *Riley* v. *Horne,* Best, C. J. said,
"If the goods should be lost or injured by the grossest
negligence of the carrier or his servants, or stolen by them
or by thieves in collusion with them, the owner would be
unable to prove either of these causes of loss; his witnesses
must be the carrier's servants, and they, knowing that they
could not be contradicted, would excuse their masters and
themselves. 2 *Moor.* & *Payne,* 337. It would be arrogant
in any nation to claim a state of morals superior to those
of England and especially to Scotland, where the same
rigor prevails; still more arrogant, not to say profane, to
claim a national perfectability so high as to rise above
temptation. Chancellor Kent admires the steady and firm
support which the English courts have given to the salutary
rule of law on this subject, without bending to popular
sympathies, or yielding to the hardships of a particular case.
2 Kent's Com. 601, 602, 3d ed.

Can the carrier in any way put an absolute limit in his
own discretion on his own duty and responsibility, thus
based upon foundations of public policy? In the first place,
how stand the books? In *Kirkman* v. *Shawcross,* 6 T. R.
14, it was held that dyers and bleachers might, by resolution
and notice to their customers, enlarge their respective liens
on goods bailed to them, so as to cover a general balance.
But Lord Kenyon, C. J. differed the case from that of
common carriers, who had no power to impose such
terms. His words are, "They have no right to say they
will not receive any goods but on their own terms;" though
he recognized their right to the notice protective against the
fraud of the bailor. So he said of innkeepers, "who are
bound to protect the property of their guests. Ashurst, J.
speaks of the obligation of innkeepers as *indelible.*" The

same distinction was recognized by Alvanley, C. J. in *Oppenheim* v. *Russell*, 3 Bos. & Pull. 42, 47. He was followed by Rook, J. in the same case. Chambre, J. added that such a notice by a carrier would be "so manifestly *unreasonable and monstrous*, that I think no legal agreement can be implied from such a notice." In *Lane* v. *Cotton*, 1 Salk. 18, Holt, C. J. places the occupation of a carrier on the list of public employments, and adds that his undertaking is in proportion to his power and convenience. In the report of the same case, in 12 Mod. he thus groups the reasons for the duty of the carrier and the innkeeper; "For what is the reason, that a carrier or innkeeper is bound to keep such goods as he receives, at his peril. It is grounded upon great equity and justice; for if they were not chargeable for loss of goods without assigning any particular default in them, they having such opportunity as they have by the trust reposed in them, to cheat all people, they would be so apt to play the rogue and cheat people, without almost a possibility of redress, by reason of the difficulty of proving a default particularly in them, that the inconveniency would be very great. And though one may think it a hard case that a poor carrier who is robbed on the road without any manner of default in him, should be answerable for all the goods he takes, yet the inconveniency would be far more intolerable if it were not so; for it would be in his power to combine with robbers, or to pretend a robbery or some other accident without a possibility of remedy to the party; and the laws will not expose him to so great a temptation; but he must be honest at his peril." Taking the arguments of Holt and Best, a relaxation of the common law rigor opens the high road to fraud, perjury, larceny and robbery. "Common carriers must not understand," says Lawrence, J. in *Nicholson* v. *Willan*, 2 Smith, 113, "that they can impose any terms which they please upon persons who send goods." Where is the boundary? The defendant in the case before us, says the carrier himself is to prescribe it. If this be so, it is easy to see that the common law is overcome, for it never was thought that if this question were

NEW-YORK,  entrusted to the party instead of the law, the fences against
May, 1838.  damage and loss would stand for a moment.  The case in
Cole       hand is not an effort to secure a fair premium for carrying
v.         baggage.  That premium is demanded and received in the
Goodwin.   name of passenger's fare.  To say the contrary, is against
common sense and a shallow evasion; nor is it indeed
pretended.  You cannot raise a distinction in this way
between a passenger and his traveling trunk, which is to
contain his clothes and money for traveling expenses, and his
books if he be on his way to college, as in this case.

I will now proceed to consider such few *dicta* and adjudi-
cations, as I have been able to find, in virtue of which I
admit if they are to prevail the common carrier will himself
hereafter give the law; and the result will be that in the
course of a short time no single person, properly sustaining
that character, will be left in the state.  To this effect
it is said we have the opinion expressed on the occasion
of a bill sent up from the house of commons, some time
after the decision in *Smith* v. *Shepherd*, in 1795, Abb. on
Ship. p. 3, ch. 4, § 1.  In *Lyon* v. *Mells*, 1 Smith, 484,
Lord Ellenborough, C. J., gives this account of the matter:
"If the carrier is at liberty to refuse *absolutely* to carry
money, he may also refuse to carry any thing else; but he
is bound to take for a reasonable reward.  *There must be,
therefore, some limitation.*  A bill was brought into parliament
to alter the law with respect to ship owners; but it was
thrown out by the law lords, that the parties might
relieve themselves against the liability *to the full extent*, by
a *special notice* and agreement.  This caused an alteration
in the bills of lading, and also *several public notices* which
are mentioned in several cases in this court."  *Morse* v.
*Slue*, 1 Ventr. 190, 238, a previous case in Car. II. was
deemed a very hard one on ship owners.  The ship was
robbed by a very strong force.  The defendant, though
acquitted by the jury of all fault, was yet held liable.  The
ship, being in *corpus comitatus*, as Hale said, on the cause
being a second time taken up by the court, was subject to
the law of common carriers.  Secondly, said he, "If the
master would, he might have made a caution for himself,

which he omitting and taking in the goods generally, he shall answer for what happens." The case of *Lyon* v. *Mells*, 1 Smith, 478, was itself of a most extraordinary character for the extent of exemption claimed under the notice ; and though the court were enabled to avoid deciding upon its general effect, it is worthy of remark, as showing to what lengths carriers immediately attempted to proceed under the favorable suggestion of the law lords. The notice was that the defendant would not be responsible for any loss or damage to any cargo unless it happened by want of ordinary care and diligence in the master and crew, and even then only to 10 per cent., this not to exceed the value of the vessel, &c., and if any person was desirous to subject the defendant for losses by the act of God or otherwise, he must make a special agreement and pay extra freight. The notice was signed by 49 owners of vessels at Hull, and published in due form. As the neglect proved was finally thought to be that of the *owner* himself, the case was held not to come within the notice, and the court did not think it necessary to say definitely whether it would protect against the negligence of the master and crew. The owner furnished a leaky vessel. And as to the 10 per cent. clause that could be applied in reason only to losses which might happen by accident. 5 East, 428, S. C. At the close of the argument as stated by Smith's Report, in which the utter illegality of the notice had been insisted on as contrary to the policy of the law, Lord Ellenborough, C. J., said that if it should be necessary to decide the case upon general principles it was of great importance. This was said in 1804, and from it I clearly collect that the power of carriers to qualify their duty to the owners, of goods fairly committed to them was still open. This conspiracy among the ship owners at Hull to subvert the common law in respect to their own community, makes its first appearance to us in *Ellis* v. *Turner*, 8 T. R. 531, A. D. 1800. And in that case I think the notice was at least shorn of its power to protect the owner against the misconduct of the master, by which the loss happened. Yet even this notice came short of some others which were as we shall see subsequently allowed; for it

left the *owner* a privilege to get an insurance under a special contract.

The contest in respect to such sweeping qualifications seems to have been less frequent since the resistance they met in *Lyon* v. *Mells*, though Lord Tenderden, late Abbott, C. J., in his Treatise on Shipping, pt. 3, ch. 4, § 8, p. 296, Story's ed. of 1822, has left on record an instance, in which he thinks that by the usual exception in the bill of lading, the master may stand protected against a loss by fire. Per Green, J., in *Gordon* v. *Buchanan*, 5 Yerg. 71, 82, S. P. In other respects the liability of both master and owners as common carriers has, in England, been modified by statutes, though these do not like the statute there in respect to land carriers, expressly preclude the proper notice, or other mode of stipulation for farther protection. Smith's Mercantile Law, 182 to 184. Id. 170, 171. Abbott on Ship. pt. 3, ch. 5, Story's ed. 1822, p. 297 to 303. But the statutes have probably been the main reliance of ship owners.

The later English books are, however, by no means barren of cases going all lengths to the absolute protection of the carrier both by water and land. In *Evans* v. *Soule*, 2 Maule & Sel. 1, a carrier by water from Bristol to Worcester, was allowed to protect himself againt a loss in consequence of the vessel having sunk, under a public notice that all goods would be carried at the risk of the owners, unless the loss or damage should arise through the actual default of the master and mariners. The validity of the notice was not debated; but the counsel for the plaintiff after assuming that the notice was valid within *Gibbon* v. *Paynton*, 4 Burr. 2298, and *Nicholson* v. *Willan*, 5 East, 507, contended, that it had been waived by the mode of the defendant's dealing. That view was overruled, and judgment given for the defendant. This decision was in 1813, Lord Ellenborough presiding, and we shall soon see how rapidly the easy surrender to a single encroachment, under the administration too of a very able jurist, led to a total conquest over what Chancellor Kent denominates, and every lawyer must agree to have been, a most salutary rule in the law of carriers. How far

he may stand justified in complimenting the firmness of the English courts in maintaining the rule will also be seen. 2 Kent's Com. 601, 2, 3d ed. Its form may still figure in our books; but I venture to say that if we yield one inch to the course of modern English adjudication, its spirit is gone. The obligation of common carriers will become as remarkable for its laxity as it has heretofore been for its rigor. I will only repeat in respect to this case, what seems to me perfectly obvious; and which I have, if not very unsuccessful, made somewhat apparent to others, that the difference between the two cases from Burrow and East, and that of *Evens* v. *Soule* is, that the notices in the former went merely to protect against *the fraud of the bailor*, and the latter to conceal and favor fraud directed against the owner, and in favor of the party giving the notice. The one was for, and the other against the public morals; the former said merely, " give me a due reward, and I will be accountable as a common carrier;" the latter, " give me the same reward" (for the carrier fixes it; it may be less, but may also be more,) " and yet, I claim to throw all risk upon you, or such a degree of it as I please." In the former, the plaintiff sought to commit and did commit actual frauds after express notice that he must be honest. He sought in that way to deprive the laborer of a reasonable reward for his hire. In the latter, he was paid all he demanded, and yet he refuses to carry under the obligation required by law.

*Lathan* v. *Rutley*, 2 Barn. & Cress. 20, was a question of pleading, and no farther touches the point before us, than as it was assumed at nisi prius by Abbott, C. J. and the counsel in the cause, that a common carrier by land might give a receipt for goods, " fire and robbery excepted." In *Maving* v. *Todd*, 1 Stark. R. 72, A. D. 1815, before Lord Ellenborough, C. J. the first question submitted was, whether the defendants stood in the relation of common carriers to the plaintiff; and it was held that they did. The goods had been destroyed by fire; but the defendants brought to the knowledge of the plaintiff, a notice *that they would not be responsible for losses by fire.* Holroyd submit-

ted whether the defendants could exclude their responsibility altogether. This was going farther than had been done in the case of carriers, who had only limited their responsibility to a certain amount. His lordship said, " *Since they can limit it to a certain sum, I think they may exclude it altogether;* and that they may say, we will have nothing to do with fire." Holroyd. " They were bound to receive the goods." Lord Ellenborough. " Yes, *but they may make their own terms.* I am sorry the law is so; it leads to very great negligence." And the plaintiff was nonsuited. This case certainly goes the whole length. The goods were committed to the carrier in perfect fairness. A subsequent case in the same volume, *Leeson* v. *Holt,* 1 Stark. R. 186, A. D. 1816, is still broader. The defendants, common carriers, received chairs of the plaintiff to be carried from Nottingham to London; but they had published a notice *that all packages of looking glass, plate glass, household furniture, toys, &c.* were to be *entirely at the risk of the owners as to damage, breakage, &c.* The main question was, whether this notice had been brought to the knowledge of the plaintiff's agent; and the fact was submitted to the jury; in charging whom Lord Ellenborugh, C. J. said, " If this action had been brought twenty years ago, the defendants would have been liable, since, by the common law, a carrier is liable in all cases except two: where the loss is occasioned by the act of God, or of the king's enemies using an overwhelming force, which persons of ordinary means of resistance can not guard against. It was found that the common law imposed upon carriers a liability of ruinous extent; and, in consequence, qualifications and limitations of that liability have been introduced from time to time, till, as in the present case, they seem to have excluded all responsibility whatsoever; so that under the terms of the present notice, if a servant of the carriers had in the most wilful and wanton manner destroyed the furniture entrusted to him, the principals would not have been liable. If the parties in the present case have so contracted, the plaintiff must abide by the agreement; and he must be taken to have so contracted, if he chooses to send his goods to be carried after

notice of the conditions. The question then is, whether there was a special contract, &c," The jury found for the plaintiff on the question of his agent having seen the notice. See *Barney* v. *Prentiss*, 4 Har. & Johns. 317. Now in the first place, I feel quite happy to be assured by the charge of Lord Ellenborough, of what I think I had already collected from the cases, that there is no adjudication of a date anterior to the American revolution which sanctions the frittering away of the responsibility of a common carrier, by exceptions, provisos, special acceptances, notices, or otherwise, for his own exclusive benefit, and having no respect to the duty of the bailor. The concluding note of Lord Coke to *Southcote's case*, cited to us from 4 Rep. 84, which though no more than his own opinion, is yet high authority, has no specific application to the case of a carrier. He speaks of a special acceptance by bailees generally; and we have a distinction taken in *Kirkman* v. *Shawcross*, and *Oppenheim* v. *Russell*, against common carriers and innkeepers. And I feel quite confident that we have already seen a great deal of principle, and considerable in the shape of authority, and there is much more of both, running through the books, which go to sustain the distinction. With how much propriety Lord Ellenborough confined the date of the innovation to twenty years, is obvious by the previous remarks of Lord Kenyon, C. J. (A. D. 1793,) in *Hyde* v. *Proprietors of the Trent and Mersey Navigation*, 1 Esp. R. 36. He said, " There is a difference where a man is chargeable by law generally, and where on his own contract. Where a man is bound to any duty, and chargeable to a certain extent by operation of law, in such case, he can not by any act of his own discharge himself—as in the case of common carriers, who are liable by law in all cases of losses, except those arising from the act of God, or of the king's enemies ; they cannot discharge themselves from losses happening under these circumstances, by any act of their own ; as by giving notice for example to that effect. But the case is otherwise where a man is chargeable on his own contract. There he may qualify it as he thinks fit." See also Jeremy's Law of Carriers, 36.

All that Lord Ellenborough said in the two cases cited from 1 Starkie, certainly presses upon the mind when applied to *ordinary bailees*. They may make their terms; and we have seen the same thing as to carriers, so far as the terms are protective against the abuses of the bailor, or for the reasonable protection of the bailee, without hurt or serious inconvenience 'to the former. Nor am I able to make any distinction between a notice and a receipt or bill of lading. Being brought home to the plaintiff, the notice is equivalent to a special written contract. The cases, I believe, all agree in this. They may differ as to whether the restriction be a limitation of the contract, or only of damages under it, an exception, or a proviso, and so may or may not be set forth in pleading; *Clark* v. *Gray*, 6 East, 564; *Latham* v. *Rutley*, 2 Barn. & Cress. 20, and the cases there cited; but the terms of the notice, when they are admissible, enter into the frame work of the bargain, and must in some form be so regarded. The cases in Starkie, are nisi prius decisions, indicating on their face the haste and want of books which are so common at the circuit; and yet it is claimed, that they should at least strike a balance between conflicting authority, and surrender the law which shelters the travelling and trading community to the discretion of its interested carriers. It is indeed true as Lord Ellenborough remarks, that there is no stopping place; no half way house. If the carrier can divest himself of liability for destruction by one kind of accident, or by one servant, he may in the same way go through the catalogue. He may exonerate himself at least from all, except gross neglect or misfeasance; and even in respect to these he compasses nearly the same end by inverting the *onus* and darkening the horizon of evidence. I have said that relaxing the common law rigor, opens the high road to fraud, perjury, theft and robbery. It does more. Looking to the present ordinary, not to say universal means of travel and transportaion, by coaches, rail roads, steam boats, packets and merchant vessels, the mere super-addition of negligence in respect to the safety of passengers and property, would constitute a most fearful item. There are no

principles in the law better settled than that whatever has an obvious tendency to encourage guilty negligence, fraud or crime, is contrary to public policy. Such, in the very nature of things, is the consequence of allowing the common carrier to throw off or in any way restrict his legal liability. The traveller and bailor is under a sort of moral duress, a necessity of employing the common carrier under those legal arrangements, which allow any number of persons to assume that character, and thus discourage and supersede the provision for other modes of conveyance. My conclusion is, that he shall not be allowed in any form to higgle with his customer and extort one exception and another, not even by express promise. or special acceptance any more than by notice. He shall not be privileged to make himself a common carrier for his own benefit, and a mandatary, or less, to his employer. He is a public servant with certain duties defined by law; and he is bound to perform those duties. As Ashurst, J. said of the duties of inn-keepers in *Kirkman* v. *Shaw,* they are *indelible.* An inn-keeper is said to be indictable for extortion. Per Holroyd, J. in *Ansell* v. *Waterhouse,* 2 Chit. R. 4. The obligation of a jailer to keep his prisoners, is much like that of the carrier in keeping goods. Bac. Abr. Escape in Civ. Ca. (H.) He is also a public servant, and bound to perform the duties of his office. To demand and take an agreement for a special acceptance of his prisoner, would be extortion, and the qualification therefore void. In my opinion the same consequences result from the public character and absolute duties of the common carrier. I therefore think the defendants in the case at bar must take the consequence of their obligation as common carriers, notwithstanding the notice to the plaintiff. Admitting that the plaintiff acceded in the clearest manner to the proposition in the notice that his baggage should be carried on the terms mentioned, I think the contract thus made was void on his part as contrary to the plainest principles of public policy. In thus holding, we follow the law, as it is expressly admitted by the English judges to have stood at the period when our ancestors declared themselves independent. And

NEW-YORK, while we thus fulfil our constitutional duty, we are not like
May, 1838. Westminister Hall obliged to lament while we enforce. the
Cole law.
v.
Goodwin. Being also of opinion that here was no neglect on the' part
of the plaintiff in any matter of duty which he owed the de-
.fendants, it follows that I am against the motion for a new
trial upon the two points which I have heard argued.

I give no opinion upon the minor questions raised. They
were argued before I came to the bench; and being points on
which my brethren felt no difficulty, it was not thought worth
while to call the attention of counsel to them on the second
argument.

The CHIEF JUSTICE dissented. He was of opinion that
the plaintiff was chargeable with negligence, or at least want
of ordinary care in not claiming his trunk before the coach
left Hamilton, and that therefore the charge of the circuit
judge, that the defendants were bound to deliver the trunk to
the plaintiff on the arrival of the coach at Madison, qualified
only by the knowledge of the plaintiff of the usage as to the
removal of baggage from the coaches was erroneous. The
judge, in his opinion, should have submitted to the jury the
question whether in the exercise of that ordinary care incum-
bent upon all men in reference to their property, the plaintiff
ought not to have inquired for his trunk before the coach pro-
ceeded on its journey; and if they should be of opinion that he
was chargeable with negligence or the want of that ordinary
care which prudent men under similar circumstances would
have exercised, that then they should find a verdict for the
defendants. For this reason, he was of opinion that a new
trial ought to be granted.

New trial denied