Mercantile Mutual Insurance Company v. Chase.

---

### THE MERCANTILE MUTUAL INSURANCE COMPANY *v.* SYLVANUS G. CHASE and others.

The common law liability of a common carrier for the safe carriage and delivery of goods, may be limited and qualified by express contract with the owner.

Neither public policy, nor the law of the land, forbids a contract by the owner with the carrier to carry on special terms, whereby the owner shall himself assume and bear the risk of loss from accident or other causes, without actual fault or neglect of the carrier; and such contract, being voluntarily made and upon sufficient consideration, will be enforced.

*It seems*, nevertheless, that one who pursues the business of transportation as an avocation, is not at liberty to impose, upon one who offers goods for carriage, any special terms or limitation of his responsibility at the common law, as a condition upon which alone he will receive the goods for carriage.

The effect of special notices, saving clauses in bills of lading, &c., considered.

The cases of *Cole* v. *Goodwin*, 19 Wend. 262; *Hollister* v. *Nowlan*, 19 Wend. 247; and *Gould* v. *Hill*, 2 Hill, 623, commented upon.

The common law duties and responsibilities of a common carrier, and the reasons for the common law doctrine on the subject, stated.

Parties doing business ander the name and style of a "Transportation Company," advertising for patronage as such, and in that name contracting with owners to forward goods from New York to Chicago, for a compensation agreed upon, as an equivalent for the entire service, are to be deemed carriers and not forwarders merely, although they employ the conveyances of third parties only in the performance of the contract.

THIS action was brought against the defendants, as common carriers, to recover the value of goods delivered for transportation under special contracts in the following form:

NEW YORK, August 10th, 1848.—"This memorandum of agreement between the Western Transportation Company and Hamlin & Day, of Chicago, Ills., witnesseth, that the said Western Transportation Company agree to forward the goods of said Hamlin & Day, from New York to Chicago, Ills., as follows:—For sugar, molasses, coffee, iron, steel, nails, spikes and crockery, 58 cents per 100 lbs., and for all other heavy goods, 68 cents per 100 lbs., and for dry goods, 68 cents per 100 lbs., by vessels on the lakes; and for sugar, molasses, coffee, iron, nails, spikes and crockery, 68 cents per 100 lbs., and for all other heavy goods, 78 cents per 100 lbs., and for dry goods, 93 cents per 100 lbs., by steam on the lakes, subject to  *  *  *  *  *  of advance of lake freight (if any) over 20 cents per 100 lbs. on heavy goods, and 35 cents per 100 lbs. on dry goods. The dangers of the sea, lakes, rivers, fire, breakage of looking-glasses, and the leakage of oil, or other liquids, at the risk of the owner. And should a loss of any of said goods occur upon the lakes or rivers, the charges to and at Buffalo shall be paid by the owner of said goods. It is also agreed, between the parties hereto, that the Western Transportation Company shall not be accountable for loss of nuts and shot if shipped in bags. And in consideration of the above, the said Hamlin & Day do hereby agree to give the said Western Transportation Company all the goods they may have to be transported, until the expiration of this contract, upon the condition above named. This contract to expire at the city of New York, on the 31st day of October; it being also agreed

between the parties hereto, that the said Western Transportation Company shall not be held accountable for any damage or deficiency in packages of goods, if receipted at Chicago, in good order; nor for any deficiency in dry goods, boots, shoes, hats, caps and straw goods, unless such packages are properly strapped, taped and sealed when shipped. Goods to be shipped by steam, must be marked 'steam' on the packages. Goods to be shipped by vessels, must be marked 'vessel' on the packages.

> "M. B. SPAULDING,
> "Agents, HAMLIN & DAY."

The goods in question were insured against loss by fire by the plaintiffs, and were destroyed at Albany, on their passage westward, during the prevalence of an extensive conflagration. The owners of the goods abandoned to the plaintiffs, who claimed to recover in this action by subrogation to the owners' rights. On the trial the plaintiffs obtained a verdict for the value of the goods, upon which, after consideration, the court at special term ordered judgment, and the defendants appealed to the general term.

Other facts material to the questions decided, appear in the opinion of the court.

*C. Van Santvoord*, for the defendants.

The judge erred in charging, that although the shippers expressly assumed the risk of fire by the contracts executed by the parties, the provisions in the contracts in that behalf were inoperative, and had no legal effect whatever, to discharge or limit the responsibility which the law, independent of any contract, imposes upon common carriers.

And, also, in his refusal to charge that the defendants were exempted by the provisions in said contracts in that behalf from loss by fire, unless it appeared that the same happened from some negligence or fault on the part of the defendants.

The cases of *Hollister* v. *Mowlan*, 19 Wend. 235; *Cole* v.

*Goodwin*, 19 Wend. 251; and *Gould* v. *Hill*, in 2 Hill R. 623, supposed to be relied on by the plaintiffs, are cases of carriers by land, and are authorities for the position that such common carriers cannot, by any act of their own, as by notice, general or special, amounting to an absolute refusal to take goods when offered under their common law liability, nor by any contract implied or deduced from such notice being brought home to the shipper, limit their responsibility, without the express and unequivocal assent of the shipper to such limitation. The foregoing cases are not at all in conflict with the proposition, that the express assumption by the shipper, of the risk of fire, &c., founded on a valuable consideration, is perfectly valid upon him.

That the common law liability of common carriers by water, may be modified or limited by an express contract, does not admit of a reasonable doubt. (2 Kent's Comms. 600; *Schufe-lin* v. *Harvey*, 6 J. R. 171, 180; *McArthur* v. *Sears*, 21 Wend. 194; *Wyld* v. *Pickford*, 8 Mees. & W. 443; *The New Jersey Steam Navigation Co.* v. *The Merchants' Bank*, 6 How. 344.)

The authorities calling in question the validity of a stipulation, whereby the risk of fire, &c., is thrown on the shipper, are applicable only to a case where the goods are delivered to the carrier, under circumstances which make it obligatory upon him to take the goods under the full obligations imposed upon a common carrier by the common law, independent of any contract; as in the ordinary case of a delivery, or offer to deliver goods to a common carrier, in and according to the ordinary course of his public employment as a common carrier, subject to the liability of the shipper to pay the established or customary price at the time of such offer, or a reasonable price proportionate to the nature of the service and the risk incurred.

As to circumstances under which he is bound so to take goods, see 2 Kent's Comm. 599; Opinions of the Judges in *Hollister* v. *Nowlan*, 19 Wend. 234; and *Cole* v. *Goodwin*, Id. 251.

Where the transaction between the shipper and carrier is

out of the ordinary course of dealing with common carriers in the exercise of their public employment, there can be no doubt of the validity of a stipulation varying or limiting the common law responsibility of a carrier. (*Edwards* v. *Shurrat*, 1 East, 604; *Gibbon* v. *Paynton*, 4 Burr. 2298, 2301, 2302.)

The terms of the contracts, under which the goods in question in this action were delivered to the defendants, show that the transaction was out of the ordinary and usual course of dealing with a common carrier, in this, that the defendants stipulate in effect to carry all the goods that the shippers may have to be transported any time between the 10th of August and the 31st day of October, without reference to their having requisite conveyance to carry them at the time the goods may be offered, and at a stipulated price, based upon the assumption of certain risks by the shippers, as appears from the contracts; thereby depriving the carriers of the benefit of any advance in price, or the right to charge a price proportionate to the risk incurred.

It follows, that the judge erred in holding that although the goods were delivered to the defendants, under or pursuant to the contracts with the shippers proved, they were, notwithstanding, delivered to them under the full responsibility of common carriers.

Upon the sound construction of the contracts, proved by the defendants, the judge should have charged the jury, that the defendants were not liable for the loss of the goods in question, unless it appeared that the same happened from some negligence or fault of the defendants. (*New Jersey Steam Navigation Co.* v. *Merchants' Bank*, 6 How. 344.)

The judge should have allowed the proof offered, that the defendants were forwarders. (*Van Santvoord* v. *St. John*, 6 Hill, 157; *Roberts* v. *Turner*, 12 J. R. 232; *Brown* v. *Dennison*, 2 Wend. 593.) The defendants should have been allowed to prove that there was no negligence on their part.

*A. Dickinson*, for the plaintiffs.

The several exceptions of the defendants to the ruling of the judge, are not well taken.

They were precluded by their receipts given for the goods, from all attempts to change or shift their liability. The word "forward," used in the contracts, does not make them forwarders; the same word was used in *Gould* v. *Hill*, 2 Hill, 623.

The judge ruled correctly in excluding the testimony offered to show that the goods were destroyed by a fire, which was extended by the wind or tempest, and in confining the defendants to the proof that the destruction was caused by the wind and tempest, and that the defendants were bound to answer for the destruction by fire, however it was extended, unless they were discharged by the contracts, or unless it was caused by the "act of God."

The judge also ruled correctly, that although the shippers expressly assumed the risk of fire by the contracts executed by the parties, the provisions in the contracts in that behalf were wholly inoperative, and have no legal effect whatever to discharge or limit the responsibility which the law imposes upon the defendants as common carriers, independent of any contract.

BY THE COURT. WOODRUFF, J.—The plaintiffs in this case were insurers of the goods of Hamlin & Day and others, against loss by fire, and the goods having been destroyed at Albany, by a very extensive conflagration in August, 1848, while the goods were on their passage from New York to the western states, the owners abandoned to the plaintiffs and received the amount of the insurance. The plaintiffs thereupon, claiming by subrogation to the rights of the assured, brought this action against the defendants as common carriers, to recover the value of the goods lost, and had a verdict at the special term, upon which, after consideration of the case reserved, the court gave judgment for the plaintiffs.

. Upon various exceptions to the rulings of the judge on the trial, to his charge to the jury, and to the final decision on the case reserved, the case now comes before us on bill of exceptions, by appeal from the special term.

The carriage of the goods in question was undertaken by the defendants, under special contracts in writing, executed by themselves and the owners of the goods, in which, by the terms of the contracts, they agree "*to forward* the goods of the said Hamlin & Day from New York to Chicago," and other goods to other places, designated in the several contracts; and the defendants insisted on the trial, and now insist, that by such undertaking, in connection with the fact that they directed the goods to be delivered to boats belonging to other parties—not being themselves proprietors of any boats or vessels—the defendants became and were "forwarders," and not "carriers," and were, therefore, not liable, unless guilty of negligence.

The use of the term "forward," in the contracts, is controlled by the nature and extent of their actual undertaking, and did not make them forwarders in the technical sense of that term; an agreement "to forward from New York to Chicago all the goods Hamlin & Day might have to be transported," embraced *carriage*. It became the duty of the defendants to deliver the goods in Chicago; whether they used the term " carry," or " transport," or " forward," the goods from New York to Chicago, is wholly immaterial. Their duty embraced every thing necessary to be done to accomplish a delivery of the goods at the place designated, and the compensation reserved in the contract was accepted as an equivalent for the whole service. Whether they used their own boats or vessels in the service, or made their own private arrangements with other owners of boats, to perform the actual transportation, did not affect their relation to the owners of the goods, with whom they had agreed to receive and deliver them.

On the other hand, the plaintiffs insist, that as each package of goods was delivered to be carried, the owners received a general receipt, containing no reservation or exception of any risks, and, therefore, whatever were the terms or the legal effect of the special contracts, they are to be deemed waived by the subsequent receipts, which contained no reference thereto, and that such receipts preclude the defendants from alleging that the goods were received upon any special conditions.

By a memorandum upon the contracts themselves, the goods were to be sent by the owners " on board Swiftsure line of tow boats, foot Broad st." In obedience to this direction, the owners sent their goods to that line, and as the goods were from time to time delivered, the person attending to the receipt of goods there, signed receipts or memoranda in general terms, acknowledging that the goods were received on board in good order, but in no manner *expressing* the undertaking of the defendants in relation thereto.

So far from altering or contradicting the special contracts, these receipts are in harmony with and sustain them. By the special contracts the owners were to deliver their goods on board the Swiftsure line, and these receipts were proper vouchers to show that they had done so. No new contract was thereby created; it was upon such delivery that the duty of the defendants under their special contracts commenced.

Besides, if there was any inconsistency between the receipts and the special contracts, the contracts must govern in this case, because there was no evidence whatever that the Swiftsure line, or any of its agents, had authority from the defendants to receive goods *for them* upon any other terms than those contained in the contracts.

The facts in this case, therefore, are as follows : The defendants, under the name of the Western Transportation Company, were carriers for hire, receiving goods and undertaking to forward them to western places and states, through and beyond the state of New York, under special bills of lading, signed by their agent, or under special contracts with the owners or shippers, (the nature of which I will consider hereafter,) both containing special exceptions, in form, relieving them from any liability for losses arising from " dangers of the sea, lakes and rivers, fire, breakage of looking-glasses, "&c. ; and while so engaged, to wit, on the 10th day of August, 1848, they entered into a written contract with Hamlin & Day, by which they agreed to forward all the goods of Hamlin & Day from New York to Chicago, Illinois, for a period therein mentioned, and

for prices therein expressed, and with a specific exception declaring the above mentioned perils to be at the risk of the owners of the goods. And upon these conditions Hamlin & Day agreed to deliver to the defendants, to be forwarded, all the goods they might have to be transported until the expiration of the period fixed by the contract.

The other owners of goods, the loss of which is the subject for which recovery is sought in this action, delivered their goods in pursuance of contracts of the same date, and containing precisely the same conditions, and it is therefore conceded that the liability of the defendants is alike in respect to the loss of all the goods in question.

Under the facts above stated it may be plausibly urged, that inasmuch as there is no evidence whatever that the defendants ever, in any instance, became carriers of goods upon any other terms than those expressed in the special contracts and special bills of lading above mentioned, they are not, and never were, common carriers. That the character of their business never corresponded with the description of a common carrier as defined by law. That they are at most special carriers in respect to all the goods which they have ever transported or received, or offered to receive. That they have never advertised for goods on any other footing, nor held themselves out to the public as common carriers, nor offered "to carry the goods of all persons indifferently." (*Gisbonne* v. *Hurst*, 1 Salk. R. 249.) And that they, therefore, do not, and have not ever exercised an employment as carriers for hire in any other sense than a restricted one, the rights and obligations of which are defined in special terms by the agreements under which their duties are performed. That in this view they are in the exercise of a *private* and not a public employment, rendering their services—not generally to all who may have goods to be transported—but only to such individuals as may specially employ *them*, in preference to the numerous *public* carriers whose conveyances are open to all. That not having assumed to carry on the business of carriage *generally*, their character and their

duties and liabilities are to be ascertained by the precise terms of their specific engagement in each case, and not by any general rules to be implied from the nature of the business as it is usually carried on. That they therefore are not bound to receive goods which are offered for transportation unless their special terms are acceded to, nor even then, unless they choose to do so ; but like other private citizens, conduct their own peculiar business as it suits their convenience and pleasure, subject only to the duties and liabilities created by the special engagements which they voluntarily enter into or decline as suits their pleasure. That they bear to common carriers, in this respect, a relation similar to that which boarding house keepers bear to innkeepers, having no public character and owing no public duties, other than those which citizenship in general imposes. And as the result of these views, that they are ordinary bailees for hire, bound to no duties but those which by the terms of their contracts they assume, and liable only for a breach of their contracts, or for negligence in the performance of them.

This reasoning is plausible, and accords with the liberal spirit which would leave every man free to engage in any business he might choose to select, and upon any terms or conditions he should think proper, (consistent with good order and good morals,) and obtain therein such patronage as he might be able—and would at the same time leave employers free to employ him or any other, as their interest or favor might prompt. That both employer and employee in such case stand, as they ought, upon an equal footing; neither can dictate terms to the other, but each may agree to what he sees fit, and each may decline any engagement at his pleasure.

Without attempting to decide, in this stage of the inquiry, whether such a system of special carriage can, consistently with sound policy, be permitted, it is obvious that if the business is liable to this modification, at the pleasure of those who may think proper to engage in the transportation of the goods of others, upon our rivers, highways, canals, rail roads and

lakes, for their own emolument, as a constant avocation, the business of common carriage, as heretofore known, will soon cease. In a brief interval, every transportation line that carries goods from the city of New York will assume a qualified character, and refuse to carry for any but those who will subscribe to the terms and conditions which they have *prescribed* as the basis upon which *their* peculiar business is conducted. .

Besides, the argument, as applied to the case under consideration, savors much of the *petitio principii*, and may be stated thus:

"We have never assumed or undertaken to carry goods under the responsibilities of a common carrier, therefore, we are not common carriers." In other words, "We are a transportation company; we will carry goods, as an avocation, on great transportation routes leading to the western states. We aspire to public confidence, and offer, as the assurance of our title thereto, the names of some twenty firms in the states of Massachusetts, New York, Ohio, Michigan, Indiana and Illinois; but we say, in advance, that we will not be common carriers, nor bear the risks and liabilities of that employment, nor carry the goods of any but those who relieve us from such risks; therefore, we are not common carriers."

Without dwelling upon this branch of the case, or deciding whether the field of employment is open to a system of carriage of the special character above suggested, I shall rest my views upon the assumption, for the purposes of this case, that the defendants were, at and before the making of the contracts in question, common carriers, at the common law, and subject to the rights, duties and responsibilities which the common law imposes upon that class of persons. If they were *not*, and did not make themselves such by the undertaking contained in the contracts in question, then it is conceded they were not liable to the plaintiffs in this action, unless guilty of negligence.

But I shall assume, in considering what I regard as the main question involved, that the evidence, independent of the special contracts under which the goods, for the loss of which the ac-

tion is brought, were delivered to the defendants, sufficiently established that the defendants were in the exercise of a public employment as carriers for hire.

The name which they assumed, and under which they carried on their business, was an open public declaration of its general character.

The various receipts given for goods, and set forth in the bill of exceptions, the bills of lading used by them, the entitling of the special contracts under which they received the goods in question (irrespective of the excepted perils)—the testimony of a witness to his dealings with them, and the admissions of Spaulding, one of the defendants—all showed that, unless the defendants take a different character in virtue of the special contracts made with the owners of the goods lost, they were common carriers, and subject to all the liabilities which the common law attaches to that character.

And assuming this, the question pressed upon our consideration, and which I propose to discuss, is, whether they are liable for a loss occurring by one of the perils which the owners, by express contract, agreed should be at their (the owners') risk?

And it is to be observed, with a view to the present case, that the defendants on the trial offered evidence to show that the prices agreed upon in the contract, to be paid for the transportation, " were based " on the owners taking the risks which, by the terms of the contract, they assumed; and also that these prices were not a fair and reasonable compensation for transporting the goods, under the ordinary risks and responsibilities of a common carrier. I think such evidence was unnecessary and improper, for the contract itself imports, by legal implication, that the prices named therein were the *equivalent* for the duties assumed, and they are to be deemed exactly proportioned to the services to be rendered and the hazards to be incurred. The evidence rejected was only to that purport, and went no further than the contract itself. But whether the evidence was properly or improperly rejected, it having been in fact rejected, that rejection, or what I conceive to be the bet-

ter view, the true legal construction of the agreement, under which the goods were delivered, presents the case, for the purposes of this appeal, thus:

A merchant, foreseeing that in the course of the fall of the year 1848, he shall have goods which he shall wish to send to one of the western states, and desiring to secure the transportation of *all* he may have, enters on the 10th of August into an absolute agreement with the defendants, in advance, that they shall carry *all* which he may have to send, agreeing, on his part, to give them *all* to the defendant, until the 31st day of October of the same year; and in consideration that the defendants will carry the goods at rates less than the fair and reasonable prices charged by common carriers under their proper risks and liabilities, the owner agrees that he will assume and bear the risks mentioned, viz.: damages of the seas, lakes, rivers, fires, breakage, leakage, &c., &c.

For every part of this contract there is a consideration, affecting both parties; even on the admission that without such contract the defendants were bound by law to carry these same goods, at reasonable rates, to the extent of their customary means of conveyance, and under all the liabilities of common carriers.

On the one hand, the defendants assumed, in advance, to carry the owners' goods for a definite future period—no matter what change in their business became desirable. However they might wish to relinquish the business of carrying, they were bound to continue it so far as to transport *these* goods.

They further assumed to carry *all the goods* the owners might have to be transported—no matter what their means of transportation might be, and although their customary modes of conveyance might be full. They were bound to provide other and greater facilities, as occasion might require, so that *these* goods should go forward at all events.

They further consented, under the special conditions named in the contract, to accept for their services and duties a rate or price less than a fair and reasonable compensation for carrying

the goods upon the usual terms and conditions of common carriage.

All these stipulations the defendants made to their own disadvantage, and to neither of them were they bound by law in the absence of the special contract.

As common carriers, they were only bound to receive goods as they were from time to time offered, and that for so long only as their interest or inclination made them desire to follow the business. They could only be required to take so many goods as their usual and customary or actual means of conveyance would conveniently allow, and were under no duty to provide extra boats or means of carriage. While for such goods as they did carry, they had a right to demand a fair and reasonable compensation, taking into view the labor and services necessary, and all the risks of carriage.

As an inducement to these extraordinary stipulations and concessions on the part of the defendants, and in consideration thereof, the owners, *on the other hand*, agreed to deliver *all* their goods to the defendants to be transported, and in respect to the risks specially named in the contract, to assume and bear them themselves—that is, in these particulars, to be their own insurers.

We have, then, in this case, a contract voluntarily entered into by both parties, upon a sufficient consideration moving to each, containing mutual stipulations, and binding each to certain duties, not theretofore obligatory upon them. It is sufficiently certain and definite in its provisions, and contains all the essential ingredients of a valid, binding contract between the parties thereto, unless those provisions are in themselves illegal; and according to its plain terms, the defendants in this case were relieved from the hazard of loss by fire, not in any wise occurring through their fault or negligence, or the fault or negligence of their servants.

The defendants on the trial offered to prove that the loss of the goods in question "was caused by the invincible and overwhelming calamity of a storm or tempest of wind extending to the goods, a fire previously burning at a distance, and that

the loss happened without any negligence, fault or misconduct on the part of the defendants.

In conformity with the views afterwards expressed in the charge to the jury, this evidence and testimony of similar purport were rejected.

The learned judge charged the jury, that "although the shippers by these contracts expressly assumed the risk of fire, the provisions of the contracts in that behalf were wholly inoperative, and have no legal effect whatever to discharge or limit the responsibility which the law imposes upon the defendants as common carriers, independent of any contract."

In another form the same proposition was in substance stated by the judge to the jury, and the charge plainly adopts the rule, that the common law responsibility of a common carrier cannot be limited by a special contract, though freely consented to by the owner of the goods, upon a sufficient consideration, and with a view to the mutual benefit of both parties.

I have yet to learn that this proposition, in the broad extent, to which it has been applied to the facts of the present case, has ever received the deliberate sanction of the courts of this state, and it is quite certain that such is not held to be the law in England. And in many of the states of the United States, the contrary is distinctly adjudged.

I am no less confident, in my opinion, that no sound principles can be invoked to sustain such an unqualified restraint upon the right of our citizens to make and maintain such contracts as their interest and convenience may prompt.

The only supposed foundation for the rule is, that such contracts are opposed to the policy of the law. If they are so— if sound legal policy requires that the owner of goods, to be transported, however willing or desirous he may be, *shall not* bear the risk of loss by an accidental fire, or demands that a carrier shall *at all events* bear that risk, whether paid for it or not, and notwithstanding the consent of the owner to his relief—courts must undoubtedly adjudge such contracts illegal, and such exemption from liability void.

I do not so understand the policy which lies at the founda-

tion of the law of common carriers, nor do I deem it fitting that our courts should, under color of promoting the commercial policy of the country, attempt to prescribe rules by which its commerce shall be conducted, against the will of the parties immediately concerned, and in opposition to *their* estimate of what their true interests require, unless that policy is too well settled to admit of much discussion.

We may rest well assured that in a matter of this kind, in this country at least, few questions of *mere pecuniary interest* will be unsafely entrusted to the disposition of the parties voluntarily bargaining together upon equal ground.

It has been said that the bailor and carrier do *not* stand upon equal ground. That the " bailor is under a sort of moral duress, a necessity of employing the common carrier," and it is hence inferred to be " against the plainest principles of public policy " to allow the carrier " *to throw off* or in any way restrict his legal liability."

In my judgment the more just inference is this : that the carrier shall not be at liberty to *impose* upon the bailor any limitation of his liability as a *condition* upon which *he* will undertake the carriage; while to say that the *bailor may not*, if he voluntarily choose so to do, and for a sufficient consideration, relieve the carrier from his liability as insurer, is to make the necessity he is under of employing the carrier, a reason for imposing upon him another necessity, viz., of employing him upon *terms which he may deem disadvantageous*.

It appears to me, that if the owner has at all times the free option to employ a common carrier, subject to all the responsibilities which the law imposes upon him, and pay such carrier the fair and reasonable compensation which the services and all the risks require; or, on the other hand, to voluntarily make what he may deem a better bargain, by assuming risks himself, and paying a less compensation, the whole policy of the law is fully satisfied. It is at most the free, uncontrolled option of the owner, which that policy is intended to secure. If that be preserved, the carrier stands upon no vantage ground, and no duress, " moral " or otherwise, controls the bailor ; while,

at the same time, the carrier exercises his public employment and discharges his public duties, liable to the fullest extent to all except to such as deem their own interests best subserved by his exoneration.

A precise statement of the common law *duties* and *responsibilities* of a common carrier, and of the *reasons* for the common law doctrine on the subject, will serve to show that the above view is correct.

1st. The law makes it his duty to undertake the charge of transportation.

2d. He is legally responsible for losses, from whatever cause arising, the acts of God and the public enemy alone excepted.

3d. Regarding him as an insurer, the law allows him to demand a premium proportioned to the hazard of his employment.

The *reasons* for the extraordinary responsibility imposed by the law are uniformly stated to be the security of those whose exigencies compel them to employ the carrier; the danger of collusion and fraud on his part; and the difficulty which the owner must in general find in proving neglect, fraud or misfeasance. (*Coggs* v. *Bernard*, (Lord Holt,) 2d Ld. Raymond R. 909; *Same* v. *Colton*, (Lord Holt,) 1 Ld. Raymond R. 546, 655; 1 Salk. 143; *Riley* v. *Howe*, (Ch. J. Best,) 5 Bing. R. 217.)

The whole foundation of the rule is fully and pointedly summed up by Lord Holt, as follows: "This is a politic establishment contrived by the policy of the law for the safety of all persons, the necessity of whose affairs obliges them to trust these sorts of persons, that they may be safe in their dealings, for else these carriers might have an opportunity of undoing all persons that had any dealings with them, by combining with thieves, &c., and yet doing it in such a clandestine manner as would not be possible to be discovered, and this is the reason the law is founded upon in that point."

Applying the same observation to every cause of loss, whether theft, robbery, negligence or misconduct of any sort, all the learning that has since been expended upon the subject

has not shown that the policy of the law has any broader scope, nor added one additional reason as its foundation.

With these salutary rules of the common law imposing extraordinary responsibility upon the carrier, and with the politic reasons upon which they rest, the present case leads to no conflict. I fully recognize their wisdom, and the importance of sustaining the sound policy upon which they are founded.

They lead to this result:—A common carrier is bound by law to carry, and to bear these extraordinary risks, *for all who may choose* to employ him, upon the terms of paying him his reasonable compensation therefor. This is the utmost extent of the rule. It fully satisfies all the reasons for the rule. Those who undertake the employment, can neither refuse to carry *nor impose any terms* in limitation of this responsibility upon those who employ them.

It by no means follows that if one voluntarily *choose* to employ them *upon other terms*, he *may not* do so,—this would be a needless restriction of the employer's right, which the rule never contemplated and which no policy requires.

It has been well said in regard to the carrier, " there is no hardship in enforcing any contract which is voluntarily made on a valuable consideration, and the assumption of the extraordinary responsibility by the carrier is in order that he may receive the freight." " In success he may rejoice in the fortunate results of his adventurous and hazardous undertaking ; in failure he cannot complain that he is visited with the necessary consequences of adventure, loss," and " the law allows him, like other *insurers*, to demand a premium proportioned to the hazards of his employment."

And it may in my judgment be said with equal truth, that so long as the law in its full rigor requires those who voluntarily engage in the business of common carriage to accept employment indifferently from *all* who have goods to transport and to carry their goods, when so requested, under all the hazards above specified, for a just reward, there is no impolicy in permitting an employer, voluntarily to enter in a contract upon a sufficient consideration, by which he shall himself assume

risks which, but for such contract, the carrier was bound to bear.

And if an owner choose to save the premium otherwise justly due to the carrier as insurer, it is no hardship that he should bear the loss, nor can I perceive that public policy in any view forbids it.

So far as the opinion expressed by Justice Cowen, in the case of *Cole* v. *Goodwin*, 19 Wend. 251, or the opinions expressed in any other case that I have examined, conflict with this view of the subject, they can only be sustained upon the ground that public policy forbids that common carriers should, while exercising their employment, be *in any manner whatever* relieved from any of the responsibilities which the common law imposes upon them. If this be so, there is an end to the discussion. If sound policy imperatively demands, that in all cases his duties shall be performed under the *actual pressure* of those responsibilities, then of course neither the owner of the goods nor any one else can by any means lighten his burthen.

But neither reason, nor experience, nor past adjudication warrant any such rigorous proposition.

I am not aware that it was ever doubted that a common carrier could effect insurance upon the property entrusted to him against any risk of accidental loss. On the contrary, such contracts may be lawfully made amounting to his full indemnification. If the policy of the law forbids that he should *be* relieved of responsibility, surely a contract of indemnity tending so directly to that result, could not be sustained.

And if a third person may insure the carrier against loss, and thus assume the risks in question, receiving a premium therefor from the carrier, why, I confidently ask, may not the owner of the goods do the same, reserving or saving out of the carriers' compensation, the premium for thus becoming his own insurer?

I should not have thought an extended discussion necessary to sustain these views, had I not found it stated in some of the commentaries, that in the state of New York it has been by a

series of cases decided, and in one expressly adjudged, that common carriers cannot limit their common law responsibility by a special contract.

If such had, in fact, been the course of decisions in this state, it would not be proper for us to refuse to yield to their authority. But I am innocent of any design to open for discussion a question that can properly be deemed settled by distinct adjudication. My own examination of the cases supposed to warrant the statement referred to, satisfies me, that whatever dicta may be found in the reported opinions, the courts have not yet given to it their express sanction by any decision which conflicts with the entire validity of the contracts in question in the present case.

I am, moreover, warranted in saying, that it is not settled in this state, that the responsibility of a common carrier cannot be limited by an express contract, voluntarily entered into by the owner of the goods, upon a valuable consideration moving to himself, by the language of the learned chief justice of the court of appeals, himself a member of the late supreme court, when the more recent decisions were made, and concurring in the judgment given there in each case. In the very recent case of *Wells* v. *The Steam Navigation Co.* 2 Comst. 209, he says, "it is, perhaps, a *debatable question*, whether common carriers can contract for a more restricted liability than the law imposes upon them, in the absence of a special agreement;" and the opinion of Senator Hopkins, in the court of errors, in *Slocum* v. *Fairchild*, 7 Hill, 292, evidently regards it as an open question, notwithstanding the case of *Gould* v. *Hill*, 2 Hill R. 623.

In the case of *Hollister* v. *Nowlan*, 19 Wend. 247, and *Cole* v. *Goodwin*, 19 Wend. 262, upon which the case of *Gould* v. *Hill*, 2 Hill, 623, distinctly rests, the judges by whom the opinions are delivered, disavow an intention to hold that such a contract is not valid. Thus, Justice Bronson says, (19 Wend. 247,) "I shall not deny that the carrier may, by express contract, restrict his liability;" and even Justice Cowen, (19 Wend. 252,) "I feel *hardly warranted* to interpose a general denial

that the extraordinary responsibility of the common carrier may be taken away by the *joint act* of the parties."

No case like the present has, so far as I can discover, been presented to our courts for decision, and if, on examination, it be found that the three cases, last above referred to, do not in principle determine the same question, I am warranted in saying that we are not bound by authority to yield the views we entertain on the subject, notwithstanding dicta may be found in the opinions apparently in conflict therewith.

Those cases hold that a common carrier cannot, by any mere act of his own, discharge himself of responsibilities which the law imposes upon him, and this is in substance the doctrine laid down by Lord Kenyon, in *Hide* v. *The Proprietors, &c.* 1 Esp. R. 36.

Thus, in *Hollister* v. *Nowlan*, an action for the loss of plaintiff's trunk was brought against stage coach proprietors who had given public notice that " baggage sent or carried in their line would be at the risk of the owner thereof ;" and although there was evidence rendering it highly probable that the plaintiff had read such notice, there was no direct proof that he had, in fact, seen it. In *Cole* v. *Goodwin*, the action was also against stage coach proprietors for the loss of plaintiff's traveling trunk and clothing, and one ground of defence was, that the defendants had given public notice, " all baggage at the risk of the owner ;" and also, that the plaintiff had actual knowledge of such notice.

And in *Gould* v. *Hill*, the action was brought against carriers of goods for the loss occasioned by fire on their passage between New York and Philadelphia—and the defence rested upon the mere fact that on the delivery of the goods to be carried, the defendants gave a receipt therefor, undertaking to deliver, " danger of fire, &c., &c." excepted, accompanied by proof that the fire was not occasioned by the negligence or want of care of the defendants.

All that was necessary to the determination of these cases, and all that they do, in fact, determine, is, that a common carrier cannot prescribe to his employers any terms or conditions

in limitation of the responsibilities which the law imposes upon him; the employers have a right to require the performance of the duties of carriage under all those responsibilities, notwithstanding such notices; and that the courts will, neither from notices nor from receipts, imply such an assent, by the owner, to the exceptions limiting the risk, as shall exonerate the carrier in case of loss.

The reasoning of the judges proceeds upon this view of the matter, then before them for decision. The inquiries propounded, elaborately discussed, and answered, were: Whether a carrier could, by *his own act*, discharge himself? Whether *he* could restrict his own liability? Whether his notice that he would not abide the liabilities which the law had attached to his employment, was binding upon his employer? Whether, notwithstanding any such notices, the owner has not *a right* to insist that his goods shall be carried under all the legal responsibilities, &c.? Whether the *carrier* can qualify his duty? Whether he can "refuse to take upon common law terms?" Whether he can "higgle with his customer and extort one exception and another?" And whether from such notices, even when brought home to the customer, or from a qualified receipt containing such exceptions, the law will imply an assent, by the owner, amounting to a waiver of his legal right to hold the carrier to all his common law liabilities?

Answering any or all of these questions against the carrier's claim to immunity, by no means decides that the *joint act* of *both* parties, *in all respects voluntary and upon valuable consideration moving to each*, may not be a full and valid discharge of the carrier from an excepted risk. Nor have I been able to find any reported case in which such a decision has been made, although the language of Justice Cowen, in *Gould* v. *Hill*, warrants the belief that such was his opinion; and the dictum of Justice Wood, in *Jones* v. *Voorhies*, (10 Ohio R. 145,) also a case of mere notice given by the carrier, is to the like effect, and is founded upon the remarks of Judge Cowen, in *Cole* v. *Goodwin*, above referred to.

There are, in form, three modes, by which it has been

insisted that the responsibilities of a common carrier may be restricted. 1st. By notices declaring the extent to which alone he will hold himself responsible. 2d. By special receipts or acceptances containing the carrier's undertaking, qualified by the exception of certain risks. 3d. By special contracts entered into voluntarily by the owner of the goods for his own advantage.

It is obvious that wherever courts have held that either of the first two modes can legally avail to protect the carrier, the *third* must, *a fortiori*, be sufficient and valid.

In regard to restrictions by *notice* and by *special acceptance*, the very learned opinion of Justice Cowen, in *Cole* v. *Goodwin*, contains a most extensive collation of cases, and a comparison and review of the leading English authorities from the earliest reports down to the act of Parliament, (2 Geo. IV. and 1 William IV. c. 68,) by which the subject is, in England, now governed.

And while the learned judge strenuously insists that the law had not been so relaxed prior to the American revolution, yet it cannot be denied that the modern English cases recognize the right of the carrier to restrict his liability, *either* by *notice* or by *special* acceptance. (See the cases collected by Judge Cowen and other cases cited below.) This is no further important to the present discussion than as it may serve to show what views the English parliament entertained of the actual state of the law on the subject, when the statute above referred to was passed.

In that statute, sections 1st, 2d and 3d provide for the *carrier's* security by requiring the owners, in certain specified cases, to disclose the nature and value of the articles sent, allowing the carrier to require suitable compensation, and making it his duty to give a receipt, in substance declaring himself an insurer. The 4th section, then, in terms, provides that no public notice or declaration by the carrier shall limit or in any wise affect his liability at common law. And the 6th section provides, that nothing in the act shall extend to, or be construed to annul, or in any wise affect any *special contract*

between the carrier and other party for the conveyance of goods.

This may be regarded not only as a declaration by the British parliament that the law *ought* to forbid any imposition of terms by the carrier, but such as fairly apprized him of his hazards and secured him his just compensation; and make utterly void any attempt, by *his own sole act*, to limit his common law responsibilities; but also, as a recognition of the fact, that according to the then state of the law, as administered by the courts, such limitation by notice was effectual.

And the 6th section is tantamount to a full declaration that *special contracts* between the carrier and his employer are valid and binding, and shall still continue to be effectual according to their tenor.

This statute, Ch. Justice Bronson, in *Hollister* v. *Nowlan*, regards as substantially re-asserting the rule of the common law. If so, then by the common law such special contracts were valid; and, I may add, that the parliament of Great Britain have, obviously, not yet even suspected that such contracts were either against public policy, or for any other reason invalid or illegal.

Without attempting to draw nice distinctions to show when special bills of lading or receipts may be so treated by the owner of the goods as to amount in legal effect to special contracts, it may be sufficient to say, that according to the recent cases in this state, above referred to, the law will not *imply* the owner's assent to the qualifications which they may contain. Nothing less than express agreement on his part will suffice to relieve the carrier from his otherwise legal risks.

In regard to such special contracts as are the subject of the present inquiry, entered into by the owner voluntarily and for his own advantage, every decision sustaining the validity of special notices and special acceptances, is an authority in support of the validity of such contracts. And the language of the elementary treatises and numerous adjudged cases in England and in this country are directly to that effect. (Chitty on Contracts, "Carriers," p. 152; 2 Esp. N. P. [621–2,] 249; 1

Selw. N. P. " Carriers," p. 418 ; Story on Bailments, § 549, and the cases cited, § 551, &c. ; 2. Kent's Com. (6th ed.) 607, and cases cited'; Angell on Carriers, § 59 and § 220, and onwardly ; 1 Smith's Lead. Ca. ; Cases cited in notes to *Coggs* v. *Bernard*, pp. 101, 2, 3. See cases collected in *Cole* v. *Goodwin*, 19 Wend. 262 ; 1 Stark. 79, 186, 418 ; 2 Stark. 53, 255, 279, 461 ; *Latham* v. *Stanbury*, 3 Stark. 143 ; 2 Camp. 415 ; 3 Camp. 27 ; 3 Dowling & Ryland, 211 ; 2 Barn. & Cress. 20 ; Buller, 71 ; 4 Burr. 2298, &c. ; Carth. 485 ; 1 H. Bl. 298, 300, n. ; 1 T. R. 27 ; 8 T. R. 531 ; 2 East, 134 ; 4 East, 371 ; 5 East, 507, and 6 East, 564 ; *Streeter* v. *Harlock*, 7 Moore, 283 ; *Richardson* v. *Sewell*, 2 J. P. Smith's Rep. in K. B. 205 ; 1 Bing. 34 ; 3 Bing. 2 ; 5 Bing. 217.)

The following cases selected from the various state reports, while the effect of mere notice or special acceptance is variously treated, will be found to sustain the right of an owner to make such special contract as he may voluntarily choose with the carrier he employs. (*Bean* v. *Green*, 3 Fairf. 422 ; *Parker* v. *Flagg*, 3 Shepl. 181 ; *Dwight* v. *Brewster*, 1 Pick. 53 ; *Beekman* v. *Shouse*, 5 Rawle, 179 ; *Relf* v. *Rapp*, 3 Watts & Serg. 21 ; *Bingham* v. *Rogers*, 6 Watts & S. 495 ; *Whitesell* v. *Cram*, 8 Id. 369 ; *Atwood* v. *Del. Trans. Co.* 9 Watts, 89 ; *Laing* v. *Colden*, 8 Barr, 479 ; *Patton* v. *Magrath*, Dud. 159 ; *Swindler* v. *Hilliard*, 2 Rich. 286 ; *Singleton* v. *Hilliard*, 1 Strob. 203 ; *Gordon* v. *Buchanan*, 5 Yerg. 71 ; *Turney* v. *Wilson*, 7 Yerg. 340 ; *Jones* v. *Pitcher*, 3 Stew. and Port. 176 ; *Dunseth* v. *Wade*, 2 Scam. 285.)

And the recent case, in the supreme court of the United States, of the *New Jersey Nav. Co.* v. *The Merchants' Bank*, 6 Howard Sup. Ct. R. 344, most unequivocally declares the validity of contracts such as are in question in this case ; and all of the judges of that court, except Justice Woodbury, who gave his opinion on another point, concurred in the decision.

I do not deem it important to enter upon the technical inquiry, whether in acting under special contracts of this description, the carrier, *pro hac vice*, lays aside his public character, or whether he is still to be deemed a common carrier

under responsibilities more limited than the law, in the absence of such contract, would impose upon him.  It is sufficient to conclude, that neither the common law, as expounded in England, nor as in modern times maintained in this country, forbids the owner of goods, voluntarily, to make a special contract with a common carrier upon a sufficient consideration moving to himself, by which such owner, reserving his premium therefor, shall become his own insurer against any accidental loss; and by so doing relieve the carrier, *pro tanto*, from risks which otherwise the carrier was bound by the nature of his employment to assume and bear.  That public policy demands no such restriction of the owner's right to employ whom he will, and upon any terms he may deem most advantageous to himself.  And that such contracts, freely and fairly entered into by both parties, are binding upon each.

Entertaining these views, and believing that they are not in conflict with any previous adjudication in a like case, I must conclude that the judge on the trial erred in refusing to admit evidence that the loss was not occasioned by negligence; and that he erred in charging that the liability of the defendants was not affected by the special contracts.

The judgment must be reversed and a new trial ordered.