R. McFarland, S. J.,
delivered tRe opinion of' the. Court.
This is an action brought by defendant in error against the plaintiff in error as a common carrier, for failing to carry and deliver a quantity of household goods, notes, bonds, checks, &c., according to contract, from Prospect Depot, in Virginia, to Bristol, Tennessee; and in another count, for failing to deliver said goods at Lynchburg, Virginia.
The plaintiff recovered in the Court below, and a new trial being refused the defendant, an appeal in error has been presented to this Court.
A number of pleas were filed. Upon some of these there was issue, and to others a demurrer was sustained. We do not deem it necessary to consider thé questions raised by these pleadings, for, in our opinion, all the defenses therein indicated, so far as they are good in law, might have been made under the first plea, which is non assumpsit We will, therefore, proceed to enquire whether the plaintiff in error had the full benefit of all the defenses to which he was entitled under the general issue.
The proof tends to show the following state of facts: The plaintiff in error was a common carrier, in the full, legal sense of the term, from Richmond, in Virginia, to Bristol, Tennessee, by way of Lynchburg. Their mode of transportation was by railway. Prospect Depot was a way station between Richmond and Lynchburg. About the middle of March, 1865, the boxes containing the goods in question, were. delivered to R. V. Davis, the *260 agent of the Company at Prospect Depot, for transportation to Bristol, the boxes being properly marked. Davis gave Mrs. Womack, the wife of the defendant in error, a receipt simply acknowledging the receipt of the goods for transportation, and received from her the amount of charges for transporting the goods to Lynchburg, in Confederate money, he not being authorized to collect the charges any further.
The proof further shows that the railway trains upon which the plaintiffs in error carried freights, continued to pass daily in the direction of Lynchburg, with, perhaps, some occasional interruption, until near the 7th of April. That, for the first four days after the goods were received, Davis carried them to the track of the railroad, as the train passed, and tendered them to the .“Messenger” as he is called, who was the agent of the company, and whose duty it was to receive the goods upon the train, and forward them. That the messenger declined to take the goods on, alleging that he had no room for them, but would try to take them next day. After this, Davis continued each day for some weeks to apply to the messenger to take the goods, but was “put off” from day to day, with substantially the same reply. That towards the 7th of April, one Thomas. Agee, who had hauled the goods to the depot, and who was the friend of the defendant in error, finding that the goods were still in' the depot, and that hostile armies were approaching, proposed to Davis to take charge of the goods, and haul them away, and take care of them, but this proposal was refused by Davis. On the 7th of April, the depot was captured by the United States forces, and the goods cap *261 tured or destroyed, except a.i small quantity that were af-terwards recovered by the defendant in error.
The proof for the plaintiff in error shows that, at the time the goods were received, Prospect Depot was inside the military lines of the Confederate forces, and so remained until the 7th of April. That the line of railroad referred to was not owned by them, but that they hired from the railroad company a car which they used on each trip 'for the transportation of their freight. The proof further shows that betweén the 16th of March and the 7th of April, large quantities of freight were sent from Richmond and other points in the direction of Lynch-burg; that the Confederate military forces had the preference upon the road, and on some occasions the “Express car” was taken from the plaintiff in error, for the use of the military, and the proof renders it probable that the express cars, during that period, were loaded to their capacity, when going in the direction of Lynchburg, before they reached Prospect Depot.
It was further proven by the plaintiff in error, that they generally used a printed form of receipt which they gave when goods were delivered to them, but at the time-of this transaction, the agent, Davis, had none of these blanks on hand.
It was also proved by them, that when Mrs. "Womack was asked what the boxes contained, she replied that they contained “beds, bed clothing, wearing apparel,” etc., but did not disclose that they contained bonds, notes, or anything of that character, the question being pressed upon her no further.
*262 Upon this, various questions are made and argued as to the action of the Court below.
1. His Honor, the Circuit Judge, was asked to instruct the jury, that if the charges for the transportation of the goods were paid in Confederate Treasury notes, this being the consideration of their undertaking, the contract would be void, and no recovery could be had. This instruction was refused, and we think properly. Conceding, for the argument, that Confederate notes loaned, would not form a good consideration for a promise to pay money, we think the doctrine has no application to this case. The consideration of the undertaking upon the part of the plaintiff in error, was, that the goods should be then and there delivered to them, to be carried for hire, to be then or afterwards paid to them. For this they had a lien upon the goods. If. they chose voluntarily to receive the charges in advance, in Confederate money, we hold that this did not relieve them from their obligation to carry the goods according to the contract, or from liability for the loss of them. It has furthermore been held at the present term, that a contract founded upon a consideration of “ Confederate money” is not necessarily illegal.†
2. The Court was asked to instruct the jury, that if a receipt was executed by the agent of the company, upon the delivery of the goods, this receipt would be the highest evidence of the contract, and no parol evidence could be heard to establish the contract.
In response to this “ his Honor told the jury that if *263 the proof showed that a receipt was executed at the time of the delivery of the goods, and that it was lost or unintentionally misplaced, then parol evidence is admissible to prove the contents thereof, and that the plaintiff having made oath of the loss or unintentional misplacing of the receipt, parol evidence of its contents might be looked to.”
The affidavit referred to does not appear in the record. The record purports to contain all the evidence. This affidavit however was no part of the evidence to be submitted to the jury; it simply serves the purpose of laying the foundation for the introduction of parol evidence of the contents of the paper. The plaintiff in error having failed to incorporate this affidavit in the bill of exceptions, we must presume that the affidavit was made as stated by his Honor in his charge, and met the requirements of the law in such cases, and that the evidence was upon this ground properly admitted.
Again, according to the evidence, this receipt did not purport to contain any contract, but was simply an ac-knowledgement of the receipt of the goods for transportation. In such a case, on the receipt of the goods, for transportation, without any express stipulations as to the measure of liability, the law supplies the contract, and fixes the rights and liabilities of the parties, and the mere delivery of the property, which is the only fact intended to be established by these receipts, may as well be proven by parol evidence as otherwise.
3. The defendant offered in evidence a receipt which seems to have been a printed form, such as the Express Company were in the habit of using. This receipt con *264 tains many limitations upon the company’s common law liability as carriers, and in fact, provides that they shall only be liable in case of gross negligence, or fraud of their agents, and throws the burden of proving this upon the other party; and upon this, the Court was asked to instruct the jury, that, if Davis was only authorized by the company to execute receipts in this form, then he was only a special agent of the company, and they would not be bound by any receipt he might give in a different form.
Upon this, his Honor instructed the jury that they could not look to this receipt or copy of a receipt at all, “as there was no original;” and further, if Davis assumed to act as the agent of the Express Company at Prospect Depot, and the company recognized his act as such agent, they were bound by his acts; and if the company gave private instructions to Davis, their agent, and such instructions were not made public, and brought home to the plaintiff, he would not be bound thereby.
It will be observed, that the receipt offered in evidence, does not purport to be either the original or a copy of the one used in this case.
It is a receipt dated 20th April, 1865, to 1ST. Bleak-ley, for one bundle valued at $60, marked A. J. Brady, Greensboro, Ga. Whether this receipt was a real transaction, and was actually given as it purports, or was only a blank filled with fictitious names, does not appear. The object in either case, was the same, merely to show the form of the receipt used by the company. There is no evidence to show that this receipt, or any one like it, was brought to the attention of the de *265 fendant in error, or his wife ■ or agent, at the time the goods were delivered, or any intimation given to them at any time, that the company’s liability was to be anything less than the law attached in such cases.
The question whether common carriers may limit their liability by notice of this character, or even by an express contract, has been much discussed, and upon it, there is a conflict of judicial opinion. The question is one of great practical importance, owing to the vastly increased number of business transactions of this character, but it need not be definitely settled in this case. •
The case of Turner v. Wilson, 7 Yer., 340, was an action of this character, for failing to carry and deliver cotton, according to contract. In that case, a receipt was given, specifying that the dangers of the river only were excepted. Evidence was offered of a custom which was generally known, by which the carrier was to be liable only when the loss occurred from negligence or dishonesty upon his part. The Court excluded the evidence and held the carriers bound by the common law liability, except only to the extent it was limited by express contract.
In this case there is no proof that the conditions annexed to this receipt formed any part of the contract; that the defendant in error had any notice, or was in any manner connected therewith, and his Honor was not in error in excluding the evidence, although the true reason for doing so ' was not fully and accurately stated.
The case of Walker v. Skipwith, Meigs’ R., 502, *266 was an action to recover the value of baggage delivered to the agent of the. defendants, who were the proprietors of a stage line. The defendants proved that Lyle, the agent, was instructed that “no package or parcel of any kind, should be sent upon the stage, unless it constituted a part of the baggage of a passenger, or was under the care of a passenger, except at the risk of the owner or person sending such package or article,” and it was further proven that a notice of this character was posted up in the stage office, and that one Swan, by whom the package was sent, and delivered to the defendants’ agent, was also informed of this. The package, however, was allowed to go upon the stage, and was lost.
The Court held that Lyle, having acted as the agent of the defendant at that office, and being authorized to transact all their business of a particular kind, he was a general agent, and that other parties were not bound by private instructions, not brought directly to their notice; and in that case, the defendant was held liable for the property. In this case, the instruction of the Circuit Court was substantially in accordance with the above principle, and we think it was not materially erroneous.
We are of opinion that the plaintiff below having waived his claim to any recovery for the notes, bonds, bills, do., contained in the boxes, and the court having told the jury that the concealment by the plaintiff’s wife of the fact that the boxes contained these articles, if not made with a fraudulent purpose, would not defeat the plaintiff’s right to recover for the balance of the property, there was no error in this part of the case.
We further hold that the fact that the plaintiff *267 in error did not have the necessary cars or means of transportation to carry the goods after they were received, is no defense unless it was expressly stipulated at the time that such was to be the extent of their obligation. If they received the goods without any express contract, the law fixes their liability, and they were bound to furnish the transportation and carry the goods, and could only be excused by the act of God or the public enemy. This is a well settled principle of law. Johnson v. Friar, 4 Yer. 48; Turney v. Wilson, 7 Yer., 340: Walker v. Skipwith, Meigs, 502; East Tennessee and Georgia Railroad Co. v. Nelson, 1 Cold., 272.
Many authorities go further, and hold that this liability cannot he limited by notice or express contract Hollister v. Newland, 19 Wend., 234; Cole v. Godwin, 19 Wend., 251; Gould v. Hill, 2 Hill., (N. Y.,) 623.
In view of the fact of the constantly increasing business of this character, and the great power exercised by common carriers over the lives and property of the citizen, we are not disposed to weaken, in any degree, the force of this rule.
4. Are the United States troops, who, it is alleged, destroyed these goods, to be regarded as “the public enemies,” or “the enemies of the country,” in the sense of the law, so as to excuse the plaintiff in error for the loss of the goods caused by these acts, without fault on the part of the agents of the company? His Honor, the Circuit Judge, decided this proposition in the negative, and said: “ The United States army or troops were not enemies to the Govern *268 ment, or public enemies; they were public friends and friends to the- Government; there was but one Government in the United States and that was the United States Government.” Consequently the United States troops, under General Stoneman, a United States General, and commanding for the United States, were not the enemies of the United States Government.” His Honor further told the jury “that the Confederate States never were recognized by any Government as a Government de jure or de fueto. Our Supreme Court recognized them as belligerents so as to regulate criminal intent in robbery and some other felonies, but no further. The army of the so-called Confederate States was an unlawful combination, nothing but a mob, however huge its proportions may have been; consequently if the goods were destroyed by the United States troops that would not exonerate the company.”
We are of opinion that the definition, as above given by his Honor, of the character of the late war, and as to the status of the Confederate Government, is not correct or accurate; but the only question of practical importance, is, was he correct in holding that the United States troops were not not to be regarded as the public enemy, against whose acts the plaintiff in error did not insure. • If he was in error in this, it was an error affecting the merits, and a new trial should be granted. If, on the other hand, he answered .this question correctly, then the error which followed in giving a definition of the character of the rebellion — a definition which was unnecessary — was immaterial, and could not have *269 prejudiced the plaintiff in error. The term “public enemy,” or the “enemy of the country, has, in general, a technical legal meaning. It is understood to apply to foreign nations, with whom there is open war, and to pirates, who are considered at war with all mankind; but it does not include robbers, thieves, or rioters or insurgents/whatever be their violence.” Story on Contr., 752.
In England, the term “public enemies,” or “the King’s enemies,” as applied to the law of treason, has been held not to apply to insurgents or rebels, they not being enemies. Hawkins’ Pleas of the Crown, 55.
It has been held by the Supreme Court of the United States, in a number of cases known as the Prize Cases, that the late rebellion was “a war” in the legal sense, as contradistinguished from a mere insurrection, and that as a consequence of this in the conduct of the war during its pendency, the persons living upon either side of the line dividing the contending forces, were to be regarded as enemies of the other, to the extent to authorize the y forfeiture of the property of either captured by the other upon the high seas.
In the case of Thorington v. Smith, 9 Wallace, 1, Chief Justice Chase classes the Confederate Government among that class of cases where a foreign government, at war with our own, for instance, obtains temporary possession of a portion of our country, and establishes their authority over it, and enforces the same by military power; and referring to the Confederate Government, says: “Belligerent rights were conceded to it, and thereafter its territory, held to be enemy’s territory, and for most purposes, its inhabitants held to be enemies.”
*270 It is clear that, during the war, the parties upon each side treated each other as enemies, and this was justified by the laws and usages of war.
As an- abstract proposition, it can not be doubted that the United- States Government was the rightful- government, and that the war was rightfully prosecuted for the enforcement of its laws; and the attempted revolution being unsuccessful, no portion of the citizens were at any time released from their allegiance to the rightful government, however they may be excused or justified in rendering obedience to the usurped government, in civil matters, so long as this obedience might have been enforced by actual military power; and we are not to be understood as announcing the proposition that, in reality, the United States Government or troops, were the public enemy of its own citizens during the progress of the war.
But in construing this contract, and determining the rights and liabilities of the parties themselves, we must give to ,the term “public enemy,” or “enemy of the country,” the meaning that attached to it at the time and place the contract was made. We have seen that at the date of this transaction both parties resided within the military lines of the “Confederate States.” We have also seen that at that time, “for most purposes,” the people upon each side of the dividing line were treated as the enemies of the other. So that the term “public enemy,” or “enemy of the country,” as understood and applied by the contracting parties at the time, included the troops' of the United States Government, and that the plaintiffs in error are not, under the cir *271 cumstances, to be beld as insurers against, loss tbat might occur by the act of the United States troops.
Such was not the legal import of the contract they made, or its meaning as they then understood it.
It follows, therefore, that while in one sense the proposition of his Honor was . correct, it was not the proper instruction applicable to the facts of the case. For this error alone we reverse the judgment, and remand the cause for a new trial.
There is evidence in the record, upon which the plaintiff in error might well have been held liable for their failure to carry the goods or return them before the time they are alleged to have been destroyed by the United States troops; but as this was a question of fact, they were entitled to have the case submitted to the jury upou a correct charge.
Reverse the judgment.

 See Naff v. Crawford, ante 111.