## C. & O. Ry. Co. v. O'Gara, King & Co.

.(Decided September 27, 1911.)

Appeal from Kenton Circuit Court.
(Criminal, Common Law and Equity Division).

1. Common Carrier—Connecting Line.—In the absence of a special contract a common carrier is not responsible beyond the terminus of its own lines; its duty is to carry freight delivered to it without unreasonable delay to the terminus of its own line, and there deliver it to a connecting carrier within reasonable time.

2. Same.—If, from any unusual or unexpected cause, the connecting carrier cannot furnish facilities for continued transportation, it is the duty of the original carrier either to promptly forward the freight by some other route, or to notify the shipper of the facts, and for failure to do so, the carrier is liable to the shipper for any damage which results from unreasonable delay.

3. Common Carrier—Shipper.—Where a fuel company which was owned by, and was the distributing agent of several mining companies, recited the fact in its bills-of-lading that the coal was shipped by one of the mining companies on account of the fuel company which had sold the coal and was shipping it to the consignee, the fuel company and not the mining company was the shipper.

4. Common Carrier—Notice to Shipper.—While it is within the power of the carrier to qualify his risk by special contract, it cannot do so by a mere notice to the bailer, or by anything less than a special or express contract qualifying his common law liability.

JOHN GALVIN and MAURICE GALVIN for appellant.

S. D. ROUSE, MORISON R. WAITE and JOHN R. SCHINDEL for appellee.

OPINION OF THE COURT BY JUDGE MILLER—Affirming.

The appellee, O'Gara, King & Company, an Illinois

corporation, doing a wholesale coal business in Chicago, sued the appellant railway company in the Kenton Circuit Court and recovered a judgment for $6,834.30 as damages for the delay in the carriage of 62 car loads of coal from the Kanawha Coal District in the neighborhood of Charleston, West Virginia, to Chicago. The coal was shipped to appellee pursuant to an order given January 23, 1903, by the W. J. Hamilton Coal Company of Columbus, Ohio, to the Kanawha Fuel Company to ship to appellee all the coal of a certain kind it could furnish until further notice. The coal was to be shipped over the appellant's road from West Virginia to Cincinnati and thence over one of its connecting lines from Cincinnati to Chicago—either the C. C. C. & St. Louis Ry. Co. commonly called the "Big Four" Railway; the P. C. C. & St. Louis Ry., which is a portion of the Pennsylvania system, and known as the "Pan Handle" road; or the Cincinnati, Hamilton & Dayton Railroad, which runs from Cincinnati to Indianapolis, and thence by a traffic arrangement over the "Monon" Railroad, into Chicago.

The coal shipments of 62 cars were started from West Virginia on and between January 23rd and January 30, 1903. According to the testimony of appellant's Superintendent of Transportation the time usually required to carry the coal to the connecting lines at Cincinnati was from five to eight days, and from West Virginia to Chicago from eight to ten or fourteen days. The coal shipped between January 23rd and 30th was therefore due in Cincinnati between January 28th and February 7th. But instead of being there on time, two of the cars reached Cincinnati on February 15th and 23rd respectively; 58 arrived there on and between March 9th and 15th, while the remaining two did not arrive there until April 5th and 25th respectively. And, instead of reaching Chicago not later than February 10th, as they should have done, 19 cars reached Chicago on March 18th; 30 on and between March 19th and 29th; three in April; one on May 25th; and the last one on July 14th. Thus the bulk of the coal was delayed from five to six weeks beyond the usual time in reaching the connecting lines at Cincinnati; and even longer in reaching Chicago. The bulk of the coal should have reached Chicago between February 1st and February 15th, or earlier, and during that period the price of coal ranged from $5.50 to $7.50

per ton in the Chicago market. Appellee paid $3.25 per ton for the coal at the West Virginia mines, and the freight from there to Chicago was $1.75 per ton. About February 23rd there was a sharp decline in the Chicago coal market from $6.00 to $2.50 per ton—the price remaining at about $2.50 or $2.75 for a month; and by March 30th the Chicago price of coal mined in January and February was scarcely more, if anything, than the freight. It remained in that condition until May, by which time all but two cars of coal had been delivered. Meanwhile, on January 16, 1903, Morrison, the Chicago manager of the Kanawha Fuel Company had written that company that it was then necessary to route all cars to Chicago by way of the Pan Handle Road from Cincinnati on account of an embargo on the Big Four Road, which had been issued on January 15th. An embargo is a notice issued by a common carrier refusing to receive or carry certain kinds of freight on its line, or between certain points, and may be for a limited and definite period, or for an unlimited or indefinite period. It is the result of a congestion of business that makes it impossible for a road to carry all the freight that is offered it.

On January 31st, the Pan Handle Road sent an embargo notice to appellant at Cincinnati and Richmond, in which it declined to receive any coal from appellant for Chicago until further notice. This embargo was not recalled until April 10, 1903. Neither could the C. H. & D. Railroad take the dead freight of appellee on account of the freight congestion at Cincinnati. All of appellant's side tracks from the West Virginia coal fields to Cincinnati were filled with cars of freight, leaving only those tracks open that were necessary to carry passengers and perishable freight.

As an avoidance of liability for this long delay appellant pleaded that immediately after its connecting carriers between Cincinnati and Chicago had notified it that they could not receive the coal in question, appellant, in turn, notified the shipper of said coal—the Kanawha Fuel Company of the situation, and that any coal thereafter tendered for shipment to Chicago would only be accepted by appellant subject to said embargoes from connecting lines, and with the understanding that the shipper assumed the risk of such shipment being carried through to its destination. In support of this defense ap-

pellant showed that it had notified the Kanawha Fuel Company of the embargoes of the Big Four and the Pan Handle railroads and that rates had been withdrawn by the C. H. & D. and the "Monon" railroads but it did not show that notice had been given to anyone that if coal should be tendered it would be accepted only at the shipper's risk, or that the shipper or anyone else had assumed the risk.

At the close of the evidence the circuit judge held that the embargoes were in force prior to the shipment of the coal from the West Virginia Coal fields, and that although the Kanawha Fuel Company with knowledge of that fact, had routed the coal over the Big Four Railroad, nevertheless, it was appellant's duty to notify appellee of the existence of the embargoes; and as it had not done so, it was liable for the loss. He, therefore, peremptorily instructed the jury to find for the appellee, and it fixed the damage as above indicated.

It is conceded by appellant that it is liable if it accepted the coal from the shipper without the shipper knowing of the embargoes and without appellant having notified the shipper thereof. Appellant contends, however, that since the shipper had knowledge of the embargoes, and, nevertheless tendered the goods and asked that they be sent forward, it, in law, assumed the risk of the embargoes.

In the absence of a special contract a common carrier is not responsible beyond the terminus of its own line. L. & E. Ry. Co. v. Foster, 13 Ky. L. R. 673; L. & N. R. R. Co. v. Cooper, 13 Ib. 496; L. & N. R. R. Co. v. Central Stock Yards Co., 30th Ky. L. R. 31; Roy v. C. & O. R. R. Co. (W. Va.) 57 S. E. 39; 31 L. R. A. (N. S.) 1. It was the duty of the appellant to carry the coal, without unreasonable delay, to the terminus of its line at Cincinnati, and there deliver it to a connecting carrier within a reasonable time. But assuming that the delays and damage in this case resulted from the embargoes from the connecting lines, the appellant nevertheless had notice thereof before it received the coal for shipment.

The appellant's duty under such circumstances was stated in L. & N. R. R. Co. v. Farmers & Drovers Live Stock Commission Firm, 107 Ky., 59, as follows:

"It was obligatory upon appellant, when it received the hogs, and contracted to transport them over its own and connecting lines to a point beyond its own line, to

have known that the connecting lines were prepared to continue the transportation at the point of connection without undue delay. This was information easily within their reach in the ordinary course of business, and which it would have been more difficult for the shipper to have ascertained; and appellee had a right under the contract of shipment, to expect of appellant the proper discharge of this duty; and if, from any unusual and unexpected cause, the connecting carrier could not furnish facilities for continued transportation, it was the duty of appellant either to have promptly forwarded the hogs by some other route, or to have notified appellee of the facts, and for failure is liable to the shipper for any injury which results from unreasonable delay. See Hutchinson on Carriers, Sec. 292, and cases there cited."

Appellant treated the Kanawha Fuel Company as the shipper, and notified it of the embargoes. Appellee insists, however, that if the notice be treated as sufficient it was not given to the shipper, since it is claimed, the record shows that the coal was shipped by the constituent mining companies which owned and operated through the Kanawha Fuel Company. A fair construction of the transaction shows, however, that the Kanawha Fuel Company was the shipper. It was the distributing agent for the several mining companies that mined the coal, and, in making its shipments, and evidently for the purpose of keeping track of each mine's business, it would designate the mine from which the coal came, but in each case the coal was shipped on "Account Kanawha Fuel Company's Cincinnati Office" from which the appellant had received the order.

The notice having been given to the shipper, the next question is, was it sufficient to relieve appellant from liability? Appellant insists that the notice was sufficient under the language of this court in Orndorff & Co. v. Adams Express Co., 3 Bush, 196, where it was said:

"It has been authoritatively settled that a public notice given by a common carrier brought home to the knowledge of the shipper, entered into the contract of affreightment so far as the carrier had the right to impose such terms, either by express or implied contract, not, however, inconsistent with the express contract; but such notice will be considered in construing the con-

tract when its terms do not conflict with the express undertaking.''

But in the further consideration of the question the court, in the same opinion, on page 197, quoting Story on Bailments, said:

''And in section 571 he says: 'But an inquiry may be made whether the carrier will not be liable for ordinary negligence, as well as for gross negligence, notwithstanding such notices. * * * The question may, however, be now considered at rest by an adjudication entirely satisfactory in its reasoning; and, turning upon this very point, in which it was held, that, in cases of notices, the carrier is liable for losses and injuries occasioned, not only by gross negligence, but by ordinary negligence; or, in other words, the carrier is bound to ordinary diligence.''

It will be noticed that the language above relied upon by appellant not only expressly limits the operation of the notice to the extent that the carrier has the right to impose the terms of the notice, but also ignores it when its terms conflict with the express undertaking.

Under section 196 of the present Constitution no common carrier is permitted to contract for relief from its common law liability.   Adams Express Co. v. Walker, 119 Ky., 121.   But if the notice given should be treated as a part of the contract of shipment, it should, in no state of case, operate further than the plain scope of the notice.   In the case at bar the notice did not inform the shipper that all future shipments would be received at the shipper's risk; it merely gave notice that the embargo notices had been given by the connecting lines.   It was, therefore, not incorporated into the terms of the contract that the shipment would be at the shipper's risk, unless it be so incorporated by operation of law.   In the absence of an agreement to the effect that the shipper ships at his own risk, the contract to carry within a reasonable time which was created by the acceptance of the freight, was not modified by merely giving the notice.   This rule was explicitly announced as early as 1838 in the two leading cases of Hollister v. Nowlan and Cole v. Goodwin, 19 Wend., 251.

In commenting upon that decision Hutchinson in his work on Carriers (3rd Ed.), section 399, says:

''Their conclusion, after great deliberation, was that, by the common law, carriers never had the right to

limit their liability by such notices, though brought to the knowledge of their employers, and that, on grounds of public policy, it ought not to be allowed that they should.''

The same author, in discussing this same question in section 406, lays down the rule as follows:

''While the cases admit the power of the carrier to qualify his risk by special contract, it is at the same time denied that he can do so by a mere notice to the bailer, or by anything less than a special or express contract.''

And again in section 411:

''The courts have gone no further in this regard than to hold that no such contract can spring from a general or public notice, even when it is most explicitly shown that the owner of the goods had notice of it; and to this extent they have uniformly and persistently adhered to the doctrine of Hollister v. Nowlan and Cole v. Goodwin. And it is equally well settled that a private notice, though given directly to the owner, can not be made to bind him as a contract, unless something is done by him, besides the delivery of his goods to the carrier, to show his agreement to the terms of such notice.''

In Brown v. Adams Express Co., 15 W. Va., 812, knowledge of public notice was brought home to the shipper, but nothing was said to him at the time the goods were tendered. The court said:

''If the common carrier means to insist that in transporting these goods for the consignor he means to insist on the modification of his common law responsibilities— he should tell the consignor so at the time the goods are offered for transportation. The consignor could then accept his terms or decline to have the goods transported.'' (Page 822.)

We conclude, therefore, that the notice given was not sufficient to relieve the appellant from liability. As was said in Brown v. Adams Express Co., supra, it is more reasonable to conclude that the carrier by its acceptance of the freight receded from its position, than. that the consignor had agreed to relieve the carrier.

The appellant not only knew that its road was badly congested with freight, but it also had the best means of knowing its ability to. overcome the congestion. It has not been shown that these cars reached Cincinnati, the end of appellant's line, within a reasonable time. On

the contrary, its lines were so filled with freight that it is but reasonable to conclude that a large part of the delay was directly caused by appellant's inability to handle the freight it had theretofore accepted. In accepting appellee's freight under such conditions it was guilty of negligence. C. & O. Ry. Co. v. Saulsberry, 31 Ky. Law Rep., 624; Great Western Ry. Co. v. Burns, 60 Ills., 284; I. C. R. R. Co. v. Cobb, 64 Ills., 137.

The judgment of the circuit court is affirmed, with damages.