## RULE OF CUSTOM AS TO SHIPMENTS RENDERED INAPPLICABLE BY WARTIME RAILWAY CONTROL.

Common Pleas Court of Franklin County.

### WILLIAMS-DONAHUE COMPANY v. A. FELTY.

Decided, November 30, 1918.

*Custom and Usage—Contracts Ordinarily Interpreted with Reference to—Rendered Uninforcible where Wartime Conditions Have Forestalled Carrying out of Agreements—Shipments of Grain Made Impossible by Railway Embargo and Harmful Weather Conditions—Custom and Usage Can Not Continue an Obligation, When—Proof as to Custom—Construction to be Placed on the Phrase "Reasonable Time."*

1. While evidence as to custom and usage is inadmissible to vary the obvious meaning of words used in a written instrument, it is competent for the purpose of explaining the meaning of the instrument as a whole.

2. The usages of a particular line of trade are valid and contracts made in that line will be deemed to have been made with reference to them, where they are found to be reasonable and to have been so generally adopted by persons in that trade as to raise the presumption that they are known to all persons engaged in it.

3. But custom and usage can not establish what would constitute a reasonable time within which to carry out a contract, the further execution of which was stopped by unforeseen and impossible conditions.

4. The obligation of a grain dealer, based on custom and usage, to make contract deliveries within a reasonable time after the lifting of the railway embargo which had prevented earlier shipments, is inapplicable where the embargo was due to a world war with America participating therein, complicated by a car shortage, railway congestion and the prevalence of severe winter weather and heavy snowfall which rendered it impossible that corn shipped a long distance would remain sweet and dry.

*L. M. Sandler* and *J. F. Rogers*, for plaintiff.
*T. H. Clarke* and *C. M. Addison*, contra.

KINKEAD, J.

Plaintiff seeks to recover $4,440 as damages for breach of contract. The petition alleges that on October 10, 1917, the parties. made a contract whereby defendant sold plaintiff ten cars of new yellow corn of twelve hundred bushels each, the same to be delivered to plaintiff at Boston, Mass., at the price of $1.33 per bushel.

Defendant claims the contract called for new yellow corn, cool and sweet, to be shipped to Boston rate points, destination to be designated by plaintiff when called for by defendant. Defendant claims that the exemptions contained in the contract relieve him from his obligation because of war conditions, embargo and weather conditions resulting in excessive moisture in the corn so that it could not have been shipped to Boston points without destruction from excessive heat resulting from such moisture during transit.

Plaintiff admits that the embargo and conditions of shipment as alleged, but avers that "it is a custom with the Grain Dealers Association to allow a reasonable time to deliver grain after embargoes, strikes, car shortages and other causes beyond seller's control, are removed." Plaintiff avers in the latter part of December, 1917, and again on January 2, 1918, defendant refused to carry out the contract at any time in the future.

Jury was waived and trial was had to the court.

The claim of counsel and parties is, whether an alleged custom among grain dealers will operate as a continuance of the obligation to deliver the corn to a period beyond the time stipulated for shipment, or until a reasonable time after embargo is lifted.

By the contract defendant agreed to sell plaintiff:

"Ten cars of New Yellow corn (1200 Bu. each) at $1.33 cost and freight to Boston Rate Points. Time of shipment December shipment (Gtd. Cool & Sweet) Destination. When called for. Final destination to be given. Remarks. Subject to embargoes, strikes, car shortages, and other causes beyond sellers control. Buyer to pay any advance in freight, if any. Should railroads raise size of cars average to be figured at the market price on date of shipment."

December 8, 1917, defendant called on plaintiff for billing at once and to points not embargoed, through hauls not junction points. Plaintiff sent billing points December 19, 1917, for eight cars, only one of which was for Boston points. December 19, 1917, billings were sent for the two, neither of which were for Boston points. Cancellation was made of two cars December 21, 1917, and December 27th billing was given for one car at Elizabeth, N. J.

Defendant's letter of December 8, 1917, calling for billings, also stated:

"These loaders may call me up any moment for billing and not being able to get it out, will let the orders go overboard, as they can not hold this corn back indefinitely until some future time when embargoes are raised or cars furnished."

Letters passed between the parties in November. Defendant wrote the brokers through whom contract was made that the quality of corn was poor. The broker's reply to defendant was that this seemed to be the situation, suggestion being made that it would be hard to "know where people are going to get off who have November and December shipment corn sold here (Boston), and seems like a foregone conclusion that it would be out of condition."

The brokers thereupon suggested to defendant that it would be well

"to buy your corn that you have sold from somebody else down here, and let them take the risk of handling hot corn. If you feel this way, and will give us your limits we will do the best on it than we can for you."

The matter culminated, however, by defendant's writing plaintiff December 29, 1917, as follows:

"Impossible ship corn conditions beyond my or any human control."

January 2, 1918, plaintiff notified defendant that within twenty-four hours it would buy the corn on defendant's account and

charge loss to him. Mr. Williams of plaintiff company personally called upon defendant at Columbus, and desired to know if he ever intended to fill his contract according to its terms. Defendant replied in the negative, claiming that the contract was not good "one minute after midnight on the 31st of December," stating that he never would ship the corn.

Oral testimony has been offered concerning an alleged custom or usage prevailing among grain dealers in respect to the trade meaning and understanding of the words in the contract, viz:

"Subject to embargoes, strikes, car shortages, and other causes beyond seller's control."

It is well settled that evidence of custom and usage is admissible to explain the meaning of a written instrument. Such evidence is inadmissible to vary the obvious meaning of words used, but it is competent for the reason that by law the custom becomes part of the contract. 12 Cyc., 1081.

If a custom is general, every person who makes a contract is presumed to know the custom, and it enters into the contract and binds him. (*Horan* v. *Strachan*, 86 Ga., 408, 22 Am. St., 491.)

Parties are presumed to have dealt with reference to a general custom, and in order to correctly interpret their intentions. (*Bowman* v. *Bank*, 9 Wash., 614, 43 Am. St., 870.) A custom, if known to the parties to a contract to which it relates, is held obligatory. (*Bank* v. *Fiske*, 133 Pa. St., 241, 19 Am. St., 635, and note.) Knowledge of a usage may be inferred from circumstances or implied from its notoriety. *Barry* v. *Ry.*, 98 Mo., 62, 14 Am. St., 610. See 10 Am. St. Rep., 826, note.

Where goods are "to be taken by" a certain time, custom is admissible to show that these words meant as the purchaser might from time to time specifically order, and that if all were not ordered within the time specified it was customary to send the purchaser a bill for the balance, and to hold such balance subject to his order for a reasonable time. 12 Cyc., 1085; *Atkinson* v. *Truesdell*, 127 N. Y., 230.

Usage and custom can not alter or contradict express or implied terms of a contract free from ambiguity, nor make the

legal rights of liabilities of the parties to a contract other than they are by the terms of the contract (78 O. S., 358; *Hopper* v. *Slage,* 112 N. Y., 530, 8 Am. St., 711, and note 775) ; but usages of trade, if reasonable, and so generally adopted by persons engaged in a particular branch of business as to raise the presumption that they are known to all persons in that business, are valid, and contracts made in that business will be deemed made with reference to them. *Clark* v. *Baker,* 11 Md., 186, 45 Am. Dec., 199, and note 202.

Assuming that there is a well-established and understood custom in respect to the implied obligation of grain dealers to deliver grain sold under contract within a reasonable time after an embargo, custom or usage does not and can not settle or establish the question of reasonable time. It becomes a question of fact as developed by the special facts, circumstances and conditions.

It has been held that a general dictionary of the English language is not to be considered an authority to show on trial the meaning of a word which is relied upon as deriving a peculiar meaning from mercantile usage. (*Houghton* v. *Gilbert,* 7 C. & P., 701; 32 Eng. C. L., 829.) Quite true. Embargo as defined by Webster's International dictionary is ''To lay or put an embargo on, as ships or commerce. An edict of the government prohibiting departure or entry of ships or commerce. It may be absolute or partial. A stoppage, or impediment; a prohibition.''

Bouvier's Law Dictionary contains nothing modern or helpful, the definitions furnished by this book having no relation to the modern common use of the word.

''Words and Phrases'' furnishes the most appropriate definition, taken from *C. & O. Ry.* v. *O'Gara,* 139 S. W., 803, 806; 144 Ky., 561, as follows:

''An embargo is a notice, issued by a common carrier, refusing to receive or carry certain kinds of freight on its line, or between certain points, and may be for a limited and definite period, or *for an unlimited or indefinite period.* It is the result of a congestion of business that makes it impossible for a road to carry all the freight.''

The probability of the time of a shipment specified to be at a given time being wholly dependent upon the duration, character and extent of an existing embargo or shortage of cars, it is reasonable to conclude that a well-settled custom or usage prevalent in a particular line of trade may appropriately be resorted to for the purpose of reducing the contractual obligation to a reasonable certainty.

Pursuant to the foregoing rules and doctrines the conclusion is that the evidence establishes a trade usage and custom that there is an obligation to ship the grain within a reasonable time after the removal of an embargo.

But where the embargo as in this case is of such nature, character and extent as that brought about by the world war and American participation therein, with the shortage of cars consequent therefrom; where as disclosed by the evidence it continues for a long and indefinite time, which combined with the unusually hard winter and great snowfall which continued for such great length of time as to make it "admittedly impossible" to ship the corn to such long distance as Boston rate points it must be concluded and found that the embargo continued for such unreasonable time as to render inapplicable the rule of custom and usage contended for to the circumstances disclosed by the evidence, as well as that the defendant did not have, and could not have the reasonable time or opportunity to ship after embargo congestion removed, and that other causes made it impossible to comply with the contract.

The position of plaintiff, however, is that defendant having repudiated the contract and declined to fill the order, he may nevertheless be held. The contention is unsound for the reason that it is found from the evidence to have been impossible to have shipped the corn to Boston points for a period of three or four months or more. The congestion and shortage of cars is found to have continued practically to the present time.

The usage and custom found to have existed among grain dealers can not reasonably be held to apply to such conditions as have prevailed since the entry of this country in the war, and the governmental control of the railroads. The evidence dis-

closes that agencies for the shipping of western freight by far eastern roads to Boston points were put entirely out of business— so impossible has it been, and still is, to safely ship corn cool and sweet to such destinations. It is undisputed that at no time has it been possible to safely ship such corn through to such points.

It was suggested in plaintiff's evidence that defendant could have had the corn dried so he could have shipped it, making some adjustment. That would have been making a new contract. He was under no obligation to do this.

Responding to the contention that defendant can be held liable to respond in damages because he repudiated the contract, it may be observed that he could be held responsible in this action only in case he failed to ship the corn within a reasonable time after the removal of the embargo or congestion. The evidence fails to show that it has been possible to ship the corn at any period since; the railroads are still in the hands of the government, and the evidence fails to show that the restriction on shipping corn eastward to Boston points has yet been removed.

It would be unreasonable to hold defendant to an implied obligation based on such claimed custom or usage here shown, under such war time conditions and restrictions to even ship in the spring months. The evidence fails to disclose that the corn could then safely be shipped.

To sustain plaintiff's petition the court would be required to do so upon the basis of an implied obligation to ship the corn within a reasonable time after the suspension of the impossibility to ship. It can not be done because of defendant's flat repudiation of the contract. The evidence fails to show there has ever been a time when conditions would have warranted enforcement of the obligation.

To require him to accept his leases and adjust the difference between the market prices two, three or half a dozen months subsequent to December does not appeal to conscience or equity under the conceded conditions in this case. We have upheld the contention of plaintiff to the extent of agreeing that custom or usage may continue the obligation for a reasonable time after release of embargo and removal of embargo, but to render a

judgment for what plaintiff asks here under the conceded facts and under the unusual war time conditions would be the grossest kind of injustice. A demand for an adjustment of the seller's loss by payment of some sum to the purchaser might possibly be morally and legally proper in some instances, but it would have been quite unjust in this case.

Plaintiff is successful in securing an approval of its claim of the contract established by usage in general, though not to the unusual war conditions shown, but must fail in its prayer for judgment.

It is not necessary in order to prove a valid custom that all the witnesses on both sides of the case should agree concerning it. Testimony of one witness who has adequate means of knowledge may be sufficient to prove the existence of a usage in a given trade or business. 12 Cyc., 1101; note 31.

No doubt there is a difference in the nature and custom of selling between local buyers from local elevator men who make local purchases, and general grain dealers and brokers covering a general field in the east, north and west. The court so concludes from the evidence, and believes the custom contended for prevails among the realers in the larger field of trade, but as stated such custom and implications therefrom can not be held to the unusual conditions created by the war and governmental control of railroads and freight shipments. The character of railroad control and shipments have for the time rendered it impossible to adequately and equitably apply the rule of custom contended for in the case.

But plaintiff must fail by reason of the impossibility to ship the corn cool and sweet because of the undisputed conditions of moisture disclosed.

The finding and judgment is in favor of the defendant.